2001 UT 89

Curtis B. CAMPBELL and Inez Preece
Campbell, Plaintiffs, Appellees,
and Cross–Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Defendant,
Appellant, and Cross–Appellee.

No. 981564.

Supreme Court of Utah.

Oct. 19, 2001.

Rehearing Denied Dec. 4, 2001.

L. Rich Humpherys, Roger P. Christensen, Karra J. Porter, Salt Lake City, Laurence H. Tribe, Kenneth J. Chesebro, Cambridge, MA, W. Scott Barrett, Logan, for plaintiffs.

Glenn C. Hanni, Paul M. Belnap, Stuart H. Schultz, Salt Lake City, Evan M. Tager, Adam C. Sloane, Washington, DC, for defendant.

George C. Harris, Salt Lake City, amici National Association of Independent Insurers, National Association of Mutual Insurance Companies, United Services Automobile Association, Farmers Group of Insurance Companies, SAFECO Insurance Company of America.

## INTRODUCTION

DURHAM, Justice:

¶ 1 On August 24, 1989, plaintiffs Curtis B. and Inez Preece Campbell, sued State Farm

Mutual Automobile Insurance Company for damages arising from State Farm's decision to try a third-party automobile accident case in which Mr. Campbell was the defendant, rather than accepting offers to settle for the policy limits of Mr. Campbell's insurance policy. The jury found in plaintiffs' favor, awarding them $911.25 in out-of-pocket costs, $2.6 million in compensatory damages, and $145 million in punitive damages. State Farm filed several post-verdict motions challenging the jury verdict, which the trial court rejected. As a condition of denying State Farm's motion for a new trial, however, the trial court remitted the compensatory damage award from $2.6 million to $1 million and the punitive damage award from $145 million to $25 million. The Campbells also received a judgment from the trial court for attorney fees and litigation expenses in the amount of $801,582.48. State Farm has appealed from the judgment and the Campbells have cross-appealed the trial court's remittitur ruling on punitive damages.

## BACKGROUND

¶ 2 On May 22, 1981, while driving north on Highway 89–91 near Logan, Utah, Mr. Campbell unsafely passed a car driven by Robert Slusher (Slusher).[1] *Slusher*, 777 P.2d at 438–39. This unsafe maneuver forced a southbound car, driven by Todd Ospital, to veer onto the shoulder of the road and collide with Slusher's car a split second later. *Id.* at 439. The accident killed Todd Ospital at the scene and left Slusher disabled. *Id.* Although the initial investigation of the accident supported differing conclusions as to who caused the accident, a consensus was reached early on by the investigators and witnesses that Mr. Campbell's unsafe pass had indeed caused the crash.

¶ 3 In September 1981, Slusher filed an action against Mr. Campbell, Ospital's estate (Ospital), and Kenneth Brooks (the owner of the car driven by Todd Ospital) for damages resulting from the collision. *Slusher*, 777

P.2d at 439. Ospital filed a cross-claim against Mr. Campbell for wrongful death. *Id.* Mr. Campbell cross-claimed against Ospital for contribution. *Id.*

¶ 4 During discovery, State Farm collected evidence that blamed Mr. Campbell for the accident. At various stages throughout discovery, including as late as a month before trial, Slusher and Ospital invited State Farm to settle for the policy limits of the Campbell policy.[2] On April 23, 1983, Ospital's counsel even sent a letter to State Farm stating that State Farm "should tender its limits" because "[a] limit of $25,000 is too low to risk excess exposure by exposing its insured to personal liability." This letter also stated that if State Farm continued to oppose settlement, Ospital would seek a separate agreement with Slusher that "may not likely be favorable to [Mr.] Campbell's interests." However, State Farm never departed from its original "no settlement" stance, continuing to reject offers made following the commencement of the trial.

¶ 5 In choosing not to settle, State Farm superintendent Bob Noxon (Noxon) and divisional superintendent Bill Brown (Brown) rejected a report of State Farm investigator Ray Summers (Summers) that stated there was evidence of fault on Mr. Campbell's part. In particular, Brown ordered Summers to change the portion of his report describing the facts of the accident and his analysis of liability "wherein [he] had indicated an exposure [for Mr. Campbell], and that there could be a high settlement value on it." Additionally, after hearing from Bill Brown, Noxon told Summers that Noxon had "screwed up" by agreeing with Summers' initial analysis regarding Mr. Campbell's fault and demanded that Summers return to Noxon the letter Noxon had written indicating his approval. Subsequently, State Farm discontinued Summers' involvement in the case. State Farm hired Wendell Bennett (Bennett), an attorney who had done a considerable amount of

---

1. The facts as stated herein are drawn from the record on appeal and from the cases of *Slusher v. Ospital*, 777 P.2d 437 (Utah 1989), and *Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130 (Ut.Ct.App.1992), *cert. denied*, 853 P.2d 897 (Utah 1992).

2. Mr. Campbell's policy provided $25,000 of coverage for each person injured in an accident up to a maximum of $50,000 of coverage per accident. *Campbell*, 840 P.2d at 133.

work for State Farm, to represent the Campbells.

¶ 6 In June 1983, Ospital's estate did in fact enter into a separate settlement agreement with Slusher. Ospital had $130,000 of combined liability insurance.[3] Under the settlement agreement, Ospital's estate paid Slusher $65,000 dollars and the Ospitals promised to assist Slusher in prosecuting claims against Mr. Campbell and his insurer, State Farm. In exchange, Slusher released all claims he had against Ospital's estate. *Id.*

¶ 7 Shortly thereafter, the case against Mr. Campbell went to trial. The jury found Mr. Campbell 100% at fault for the accident and a judgment for $135,000 was entered. *Slusher,* 777 P.2d at 439. The jury also awarded Ospital damages in the amount of $50,849. In light of Bennett's numerous reassurances to both Mr. and Mrs. Campbell that their assets were safe, that they had no liability for the accident, that he would represent their interests, and that they did not need to procure separate counsel, the Campbells were utterly dismayed. To their expressions of dismay, Bennett responded by telling the Campbells that "[y]ou may want to put for sale signs on your property to get things moving," making it clear that State Farm did not intend to pay the excess judgment against the Campbells. Furthermore, State Farm declined to post a supersedeas bond on appeal in excess of their $25,000 policy limit. The Campbells immediately acquired other counsel and learned that their situation was indeed grave.

¶ 8 In late 1984, Slusher, Ospital, and Mr. Campbell entered into an agreement in which Mr. Campbell agreed that: (1) he would pursue a bad faith action against State Farm; (2) Ospital's and Slusher's attorneys would represent him in that action; (3) Slusher and Ospital would have the right to be part of all major decisions relating to that action; (4) no settlement of any claim against State Farm could be made without Slusher's and Ospital's approval; and (5) in the event Mr. Campbell recovered any monies, Ospital and Slusher would receive 90% of the sum remaining after certain agreed-upon obligations were paid. In exchange, Slusher and Ospital agreed to not seek satisfaction of their judgment from Mr. Campbell and to inform anyone checking on Mr. Campbell's credit that their judgments were not personal obligations. *Id.*

¶ 9 In 1989, this court affirmed the 1983 verdict against Mr. Campbell. *Slusher v. Ospital,* 777 P.2d 437, 438–39 (Utah 1989). State Farm then paid all of the damages awarded in the 1983 action, both its policy limits and Mr. Campbell's personal liability. Shortly thereafter, the Campbells filed this action against State Farm alleging, among other things, bad faith, fraud, and intentional infliction of emotional distress. The trial court granted summary judgment to State Farm on the ground that because it had ultimately paid all of the damages awarded, there had been no bad faith as a matter of law. Plaintiffs appealed to this court, which transferred the case to the Utah Court of Appeals, which reversed and remanded, stating that although State Farm had paid the debt, the Campbells had the right to pursue their claim that there had been bad faith in the previous dealings. *Campbell v. State Farm Mut. Auto. Ins. Co.,* 840 P.2d 130, 143 (Utah Ct.App.1992), *cert. denied,* 853 P.2d 897 (Utah 1992).

¶ 10 On remand, the trial court denied State Farm's motion to introduce the settlement agreement entered into by Slusher and Ospital before the original trial in Logan, Utah. However, over the Campbells' resistance, the trial court did grant State Farm's motion to bifurcate the trial. In phase I of the trial, the jury was to determine whether State Farm acted in bad faith. *Id.* Only if the jury found such bad faith would phase II, setting the compensatory damages award for State Farm's bad faith and addressing the Campbells' claims for fraud, intentional infliction of emotional distress, and punitive damages, occur.

¶ 11 In phase I, the jury found that State Farm had acted unreasonably and in bad faith in its decision to take the case to trial

---

3. Todd Ospital's policy provided $100,000 of coverage for each person injured in an accident up to a maximum of $300,000. Additionally, Brooks maintained $30,000 of liability coverage on the car Ospital was driving.

because there was a substantial likelihood of an excess judgment against Mr. Campbell. Notwithstanding this finding of bad faith, State Farm argued during phase II that its decision to take the case to trial was an "honest mistake" that did not warrant punitive damages. In contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide. This scheme was referred to as State Farm's "Performance, Planning and Review," or PP & R, policy. To prove the existence of this scheme, the trial court allowed the Campbells to introduce extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations. Although State Farm moved prior to phase II of the trial for the exclusion of such evidence and continued to object to it at trial, the trial court ruled that such evidence was admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages.

¶ 12 At the close of the evidence, the jury awarded the Campbells $2.6 million[4] in compensatory damages and $145 million in punitive damages. State Farm made several post-verdict motions, including motions for a judgment notwithstanding the verdict, for a new trial, and for remittitur of the damage awards. Ultimately, the trial court denied all of State Farm's motions for a judgment notwithstanding the verdict and for a new trial. However, the trial court did order a remittitur of the damage awards to $1 million in compensatory damages[5] and $25 million in punitive damages.[6] In addition, the trial court awarded the Campbells $400,834.70 (forty percent of the compensatory damages award) for attorney fees and $400,747.78 for litigation expenses, totaling $801,582.48.

## ISSUES AND STANDARDS OF REVIEW[7]

¶ 13 We list the issues and applicable standards of review in the order of their treatment in the analysis portion of this opinion.

1. Did the trial court commit reversible error in permitting an award of $25 million in punitive damages to stand?

 a. In particular, State Farm argues that the $25 million punitive damages award is excessive under both Utah and federal law.

*Standard of Review:*

 Under Utah law, seven factors must be analyzed to determine whether the amount of a punitive damage award is excessive. *See Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 808 (Utah 1991) (*Crookston I*). We have heretofore reviewed the trial court's findings of fact regarding all but the seventh *Crookston I* factor under a clearly erroneous standard. *See State v. Pena,* 869 P.2d 932, 935 (Utah 1994). Because the seventh *Crookston I* factor involves the trial court's application of the law to the facts, we have in the past reviewed the trial court's determination for correctness, while at the same time affording the trial court some discretion as to the underlying facts. *See id.* at 936–39. Recently, however, the U.S. Supreme Court has imposed a new standard of review as a matter of federal constitutional law in punitive damages cases.[8] In *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the Su-

---

4. The jury awarded $1.4 million to Mr. Campbell and $1.2 million to Mrs. Campbell.

5. The reduction resulted in an award of $600,000 to Mr. Campbell and $400,000 to Mrs. Campbell.

6. The trial court initially granted State Farm a remittitur or, in the alternative, a new trial. The Campbells accepted the remittitur.

7. We note that, in discussing the applicable standards of review in this case, we found Judge Norman H. Jackson's article in the Utah Bar Journal, 12 Utah Bar J. 8 (1999), especially helpful, and we recommend it to all appellate practitioners.

8. Although State Farm indicates in its statement of issues section that it is challenging the punitive damage award under the Utah Constitution, it has not in fact made such an argument, and we do not discuss that issue.

preme Court held that federal due process requires federal appellate courts to review punitive damage awards de novo when they are challenged on constitutional grounds. *Id.* at 1682–83. In view of the applicability of fourteenth amendment standards to state courts, we adopt the de novo standard for reviewing jury and trial court conclusions under the *Crookston I* factors.

2. Did the trial court commit reversible error by admitting "other acts" evidence in violation of Utah Rule of Evidence 404(b)?

*Standard of Review:*

█ "[W]e review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard. We review the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of that discretion.'" *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 (quoting *State v. Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837) (footnote omitted).

3. Did the trial court commit reversible error by allowing the Campbells' experts to testify because they "usurp[ed] the function of the jury, g[a]ve irrelevant testimony, evade[ed] the hearsay rules, and testif[ied] without a proper foundation?"

*Standard of Review:*

█ A trial court's decision to admit expert testimony is reviewed for an abuse of discretion. *Patey v. Lainhart*, 1999 UT 31, ¶ 33, 977 P.2d 1193; *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). Furthermore, a trial court will not be reversed for an abuse of discretion unless "there is a reasonable likelihood that the verdict would have been different if the trial court had [excluded] the expert testimony." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993).

4. Did the trial court commit reversible error in excluding evidence relating to the settlement agreement between Slusher and Ospital?

*Standard of Review:*

█ We review a trial court's decision regarding the relevancy of evidence under an abuse of discretion standard. *Bambrough v. Bethers*, 552 P.2d 1286, 1290 (Utah 1976) ("The trial court is given considerable discretion in deciding whether or not evidence submitted is relevant."); *State v. Harrison*, 805 P.2d 769, 780 (Utah Ct.App.1991) (same).

5. Did the trial court commit reversible error by ruling that Mrs. Campbell has standing to pursue a bad faith claim?

*Standard of Review:*

█ This is a legal issue, and is reviewed for correctness. *Provo City Corp. v. Willlden*, 768 P.2d 455, 456 (Utah 1989).

6. Did the trial court commit reversible error by allowing Mrs. Campbell to recover for fraud when the evidence was insufficient to support her claim?

*Standard of Review:*

█ When considering challenges to jury verdicts based on insufficiency of the evidence, "we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 467 (Utah 1996) (internal quotation marks omitted). "If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm." *Steenblik v. Lichfield*, 906 P.2d 872, 875 (Utah 1995).

7a. Did the trial court commit reversible error by allowing both Mr. and Mrs. Campbell to recover for intentional infliction of emotional distress when the evidence was insufficient to support such claims?

*Standard of Review:*

See the standard of review for the previous issue.

7b. Are the remitted emotional distress awards of $600,000 to Mr. Campbell and $400,000 to Mrs. Campbell excessive?

*Standard of Review:*

■ We consider whether there is a "reasonable basis" to support the trial court's decision. *Crookston I,* 817 P.2d at 805.

8. Did the trial court commit reversible error in awarding attorney fees to the Campbells?

*Standard of Review:*

■ Whether attorney fees should be awarded is a legal issue that we review for correctness. *Valcarce v. Fitzgerald,* 961 P.2d 305, 315 (Utah 1998). The amount of attorney fees awarded is reviewed for abuse of discretion in making such an award. *Id.*

9. Did the trial court commit reversible error in awarding more than $400,000 in litigation expenses without requiring the Campbells to specifically demonstrate that such expenses were reasonable and necessary to their claim for compensatory damages?

*Standard of Review:*

■ The question of whether litigation expenses may be awarded in a bad faith action by an insured against an insurer is one of law, which we review for correctness. The standard of review as to the amount of such expenses is abuse of discretion. *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.,* 850 P.2d 447, 460 (Utah 1993); *City Consumer Servs., Inc. v. Peters,* 815 P.2d 234, 240 (Utah 1991).

## ANALYSIS

### I. PUNITIVE DAMAGES

¶ 14 State Farm argues that the punitive damage award is excessive under both Utah and federal law. The Campbells cross-appeal, arguing that the trial court's remittitur of the amount of the punitive damages awarded was not required under Utah law. We consider the application of both the Utah and federal standards separately below.

■ ¶ 15 At the outset, we note the guidelines for trial courts contained in *Crookston I,* 817 P.2d 789, 811–12 (Utah 1991). In upholding a punitive damages award, "the trial judge must make a detailed and reasoned articulation of the grounds for concluding that the award is not excessive in light of the law and the facts," thereby "permit[ting] more effective and reasoned appellate review of the decision to uphold the award and to enable the appellate court to more carefully consider the various factors that may warrant punitives and the weight to be accorded them, while giving adequate deference to the advantaged position of the trial judge to appraise the witnesses and the evidence." *Id.* at 811. We note that pursuant to *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), we now review the factors de novo and do not defer to the trial court. When reducing an award of punitive damages, a trial court "should also explain its action" because "[t]he articulation of grounds for a remittitur ... should serve the same salutary purpose on appeal" furthered by requiring trial courts to articulate their grounds for upholding a punitive damages award. *Crookston I,* 817 P.2d at 811–12.

¶ 16 We commend the trial judge in this case for his exemplary compliance with these guidelines, and indeed for his meticulous, extensive, and very thorough written findings of fact and conclusions of law on all issues. This work by the trial judge has greatly enhanced our ability to review and organize a lengthy and complex record.

### A. Utah Law

■ ¶ 17 Both parties agree that the Utah law governing punitive damages was outlined in *Crookston I,* 817 P.2d 789 (Utah 1991), and *Crookston v. Fire Ins. Exch.,* 860 P.2d 937 (Utah 1993) (*Crookston II* ). In *Crookston I,* the court announced the follow-

ing factors to consider when awarding punitive damages:

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

*Crookston I,* 817 P.2d at 808.

¶ 18 In analyzing the appropriateness of the jury's punitive damage award, the trial court applied the seven factors outlined in *Crookston I* and remitted the award based solely upon the seventh factor, believing that the damage ratio in that case created a legal limitation. Thus, although he required remittitur of the award, the trial judge observed that $25 million "may be viewed as artificially low in that it does not capture the full amount of harm done to the Campbells as a result of State Farm's misconduct." *Id.* at ¶ 92.

¶ 19 On appeal, State Farm objects to both the jury verdict and the remitted punitive damage award, citing the following language from *Crookston I:* "punitive damages awards beyond a 3 to 1 ratio to actual damages have seldom been upheld and ... where the award is in excess of $100,000, we [the Utah Supreme Court] have indicated some inclination to overturn awards having ratios of less than 3 to 1." *Crookston I,* 817 P.2d at 810. Further, State Farm relies on the following elaboration from *Crookston II:*

> [i]t is certainly true that the punitive award here is without precedent in Utah, either as to the amount or as to the high ratio of punitive damages to hard compensatory damages. The presumption, therefore, is that the award is excessive. However, ..., this presumption may be overcome if the trial court explains why the case is unique in terms of one of the traditional seven factors or in terms of some other compelling factor.

*Crookston II,* 860 P.2d at 940 (citing *Crookston I,* 817 P.2d at 811).

¶ 20 According to State Farm, this language limits punitive damage awards to three times the amount of compensatory damages, unless the other *Crookston I* factors justify a higher ratio—which in this case, State Farm argues they do not. Thus, State Farm asserts that the trial court erred in not ordering a new trial or remitting the punitive damage award to an amount within the 3:1 ratio. *Id.*

¶ 21 Conversely, the Campbells argue that the trial court placed undue emphasis on the seventh *Crookston I* factor. Because the other factors support a large punitive damage award, they assert that the seventh factor does not mandate a remittitur. *Id.* Instead, awards with higher than normal ratios of punitive to compensatory damages are simply cause for heightened judicial scrutiny to ensure that other factors support the large award. *Id.*

¶ 22 To determine whether the trial court erred, we consider all of the *Crookston I* factors. As discussed in the issues and standards of review section, we review the trial court's conclusions under the *Crookston I* factors pursuant to a de novo standard. *Cooper Indus.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674.

### 1. The Relative Wealth of State Farm

¶ 23 The defendant's wealth is the first factor for consideration. "Punitive damages ... should be sufficient to discourage ... [the defendant], or anyone similarly situated, from repeating such conduct in the future." *Cruz v. Montoya,* 660 P.2d 723, 727 (Utah 1983), *superceded by statute on other grounds.* To calculate an award sufficient to punish and deter companies from future egregious behavior, some courts have compared the amount of punitive damages to the company's net worth. For example, the Seventh Circuit Court of Appeals has held that a typical punitive damage award may be around one percent of the defendant's net worth. *Cash v. Beltmann N. Am. Co.,* 900 F.2d 109, 111 n. 3 (7th Cir.1990). Although such guidelines are helpful in reviewing punitive damage awards, we emphasize that in Utah there is no pre-established mathematical formula for such awards.

¶ 24 State Farm argues that Utah courts have considered a corporation's wealth only to mitigate large punitive awards, and that it is not aware of "any Utah appellate decision upholding a presumptively excessive punitive exaction on the ground that the defendant happened to be wealthy." In defense of this proposition, State Farm cites to *Cruz* and *VanDyke v. Mountain Coin Machine Distrib., Inc.*, 758 P.2d 962 (Utah Ct. App.1988), two cases in which the appellate courts did in fact reduce the punitive damage award based on the defendant's wealth. However, neither of these cases holds that the wealth of a company can be considered *only* to mitigate a punitive damage award. To the contrary, they indicate that a fact finder should consider the defendant's relative wealth when calculating a punitive damage award, and that such awards should have a proportional relationship to the defendant's wealth. *See Cruz*, 660 P.2d at 726–27; *VanDyke*, 758 P.2d at 965–66.

¶ 25 Additionally, State Farm relies on two federal court cases, *Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634, 641 (10th Cir.1996), *cert. denied*, 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997), and *Utah Foam Prod. Co. v. Upjohn Co.*, 930 F.Supp. 513, 531 (D.Utah 1996). These cases likewise do not support State Farm's position. In particular, while stating that a defendant's wealth "cannot alone" justify a large punitive damage award, *Utah Foam* indicates that a defendant's wealth may be taken into account. *Utah Foam*, 930 F.Supp. at 531 (internal quotation marks omitted). Moreover, *Continental Trend* specifically states that "wealth must remain relevant" when determining punitive damage awards. *Cont'l Trend*, 101 F.3d at 641.

¶ 26 State Farm's wealth is enormous. As the trial court found, "[t]he evidence indicates that State Farm's surplus increased from $2.65 billion in 1977 to $25 billion in 1995. Its assets increased from $6.3 billion in 1977 to $54.75 billion in 1995, at an average increase of $4.3 million per working day in surplus, and $9.3 million per working day in assets.... A punitive damages award equal to one percent of State Farm's wealth would be $547.5 million. The remit-ted amount of $25 million in punitive damages represents less that 1/20th of one percent of State Farm's wealth (.0457 per cent)." Moreover, the jury's punitive damage award of $145 million is only 0.26 of one percent of State Farm's wealth as computed by the trial court, to whose judgment on this factual matter we defer. In our view, neither percentage is unreasonable, given the need to sufficiently deter and punish State Farm. *See Crookston II*, 860 P.2d at 940–41 (upholding punitive damage award that was 0.5 of one percent of defendant's net worth). Furthermore, the evidence showed that a larger than normal punitive damage award is necessary to attract the attention of State Farm officials and deter the company from further bad conduct because, as the trial court specifically found: (1) State Farm's corporate headquarters had never learned of, much less acted upon, a punitive damage award of $100 million in a previous case; and (2) State Farm's Regional vice-president for Utah testified that there was no system in place to inform the company's national headquarters of any punitive damage award, and that he did not plan to report the award in this case.

### 2. The Nature of State Farm's Misconduct

¶ 27 This factor specifically analyzes the nature of the defendant's conduct in terms of its maliciousness, reprehensibility, and wrongfulness. It mirrors the "reprehensibility" factor described by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). There, the Supreme Court stated that the defendant's misconduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575, 576, 116 S.Ct. 1589. Repeated "trickery and deceit" targeted at people who are "financially vulnerable" is especially reprehensible and worthy of greater sanctions. *Id.* Moreover, "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive" also warrant larger awards. *Id.* at 579, 116 S.Ct. 1589.

¶ 28 With these standards clearly in mind, the trial court made nearly twenty-eight pages of extensive findings concerning

State Farm's reprehensible conduct. We summarize here three examples from those findings of State Farm's most egregious and malicious behavior.

¶ 29 First, State Farm repeatedly and deliberately deceived and cheated its customers via the PP & R scheme. *See* Court's Findings, Conclusions and Order Regarding Punitive Damages and Evidentiary Rulings, *Campbell*, at 17–27. For over two decades, State Farm set monthly payment caps and individually rewarded those insurance adjusters who paid less than the market value for claims. *Id.* at 18–19. Agents changed the contents of files, lied to customers, and committed other dishonest and fraudulent acts in order to meet financial goals. *Id.* at 17–27. For example, a State Farm official in the underlying lawsuit in Logan instructed the claim adjuster to change the report in State Farm's file by writing that Ospital was "speeding to visit his pregnant girlfriend." *Id.* at 35. There was no evidence at all to support that assertion. Ospital was not speeding, nor did he have a pregnant girlfriend. *Id.* The only purpose for the change was to distort the assessment of the value of Ospital's claims against State Farm's insured. As the trial court found, State Farm's fraudulent practices were consistently directed to persons—poor racial or ethnic minorities, women, and elderly individuals—who State Farm believed would be less likely to object or take legal action. *Id.* at 26–27.

¶ 30 Second, State Farm engaged in deliberate concealment and destruction of all documents related to this profit scheme. *Id.* at 31–33. State Farm's own witnesses testified that documents were routinely destroyed so as to avoid their potential disclosure through discovery requests. *Id.* at 29–30. Such destruction even occurred while this litigation was pending. *Id.* at 30. Additionally, State Farm, as a matter of policy, keeps no corporate records related to lawsuits against it, thus shielding itself from having to disclose information related to the number and scope of bad faith actions in which it has been involved. *Id.* at 30.

¶ 31 Third, State Farm has systematically harassed and intimidated opposing claimants, witnesses, and attorneys. *Id.* at 33–37. For example, State Farm published an instruction manual for its attorneys mandating them to "ask personal questions" as part of the investigation and examination of claimant in order to deter litigation. *Id.* at 34. Several witnesses at trial, including Gary Fye and Ina DeLong, testified that these practices had been used against them. *Id.* at 34–35. Specifically, the record contains an eighty-eight page report prepared by State Farm regarding DeLong's personal life, including information obtained by paying a hotel maid to disclose whether DeLong had overnight guests in her room. *Id.* at 35. There was also evidence that State Farm actually instructs its attorneys and claim superintendents to employ "mad dog defense tactics"—using the company's large resources to "wear out" opposing attorneys by prolonging litigation, making meritless objections, claiming false privileges, destroying documents, and abusing the law and motion process. *Id.* at 36–37.

¶ 32 Taken together, these three examples show that State Farm engaged in a pattern of "trickery and deceit," "false statements," and other "acts of affirmative misconduct" targeted at "financially vulnerable" persons. *BMW*, 517 U.S. at 575, 576, 116 S.Ct. 1589. Moreover, State Farm has strategically concealed "evidence of [its] improper motive" to shield itself from liability, which was furthered by State Farm's treatment of opposing witnesses and counsel. *BMW*, 517 U.S. at 579, 116 S.Ct. 1589. Such conduct is malicious, reprehensible, and wrong.

¶ 33 State Farm responds by arguing in its brief that even if its conduct was wrong, it does not "after all, involve murder, torture, or deliberate poisoning of the environment," and thus cannot warrant millions of dollars in punitive damages. Additionally, State Farm argues that under *Crookston II,* willful calculated fraud was not sufficient to justify a higher than ordinary ratio of punitive to compensatory damages. *Crookston II,* 860 P.2d at 940.

¶ 34 State Farm fails to realize that, while *Crookston II* held that fraudulent conduct *alone* was insufficient to justify a large punitive damage award, it also observed that fraud combined with other factors justifies a

higher award. *Id.* at 940–41. Specifically, *Crookston II* stated that "an additional unique factor justifying the punitive award, both in its dollar amount and in its proportion to the hard compensatory damages [is] ... the company's 'calculated and calloused attitude' toward settling valid claims." *Id.* at 941 (citation omitted). In this case, the jury was convinced, and the evidence shows, that State Farm engaged in a widespread pattern of fraud. Moreover, the evidence of its PP & R scheme demonstrates that State Farm specifically calculated and planned to avoid full payment of claims, regardless of their validity. Thus, the nature of State Farm's conduct supports the imposition of a higher than normal punitive damage award.

### 3. Facts and Circumstances Surrounding State Farm's Misconduct

■■■ ¶ 35 This factor looks to the circumstances surrounding the illegal conduct, particularly with respect to what the defendant knew and what was motivating his or her actions. *See Bundy v. Century Equip. Co.*, 692 P.2d 754, 759 (Utah 1984). Discussing this point, the trial court referred to its previous analysis of State Farm's conduct and stated "those facts speak for themselves with respect to the type of insensitive and callous behavior exhibited by State Farm." In addition to the trial court's findings, we note that State Farm refuses in its brief on appeal to concede any error or impropriety in the handling of the Campbell case. Rather, testimony at trial indicated that State Farm was "proud" of the way it treated the Campbells. *Id.* Further, State Farm asserts that it is in fact a "victim" in this case because it is the target of a secret "conspiracy" perpetrated by the Campbells, Ospital, Slusher, and their attorneys to bring this bad faith lawsuit and to share any recovery obtained.

¶ 36 Even if we agreed with State Farm's characterization of the agreement between the plaintiffs and Ospital and Slusher, we are unable to comprehend State Farm's logic. No behavior by those parties operates to excuse State Farm's dishonest and illicit practices over the course of many years, nor its treatment of the Campbells. In fact,

without this so-called "conspiracy," which contains no illegal elements whatever, State Farm's wrongdoing would have remained unexamined and unpunished, and the direct harm to the Campbells, the indirect harm to the other parties, and the harmful effect on the larger community of all those who deal with the company, would have had no remedy. The facts and circumstances surrounding State Farm's misconduct all point to a scheme motivated by the goal of making a profit by any means necessary. We agree entirely with the trial court's conclusion that this factor supports the imposition of a higher than normal punitive damages award.

### 4. Effect of State Farm's Misconduct on the Campbells and Others

■■■ ¶ 37 This factor examines how the defendant's conduct affected other people as well as the Campbells. The larger the number of people affected, the greater the justification for higher punitive damages.

■■■ ¶ 38 Here, the effect of State Farm's conduct on the Campbells is well-documented. In particular, the Campbells lived for nearly eighteen months under constant threat of losing everything they had worked for their whole lives. This threat led to sleeplessness, heartache, and stress in the Campbells' marriage and family relationships. *Id.* State Farm argues that these were relatively minor impacts, and were not as severe as those punished in *Crookston II*, and additionally, that the alleged harms suffered by other State Farm customers cannot be considered in this case.

■■■ ¶ 39 Even if the harm to the Campbells can be appropriately characterized as minimal, the trial court's assessment of the situation is on target: "The harm is minor to the individual but massive in the aggregate." Moreover, State Farm's assertion that the trial court erred in considering alleged harms suffered by other customers is incorrect; *Crookston II* specifically allows courts to consider the effect of the defendant's conduct on others. *Crookston II*, 860 P.2d at 941. In fact, the *Crookston II* court justified a high punitive damage award based on the fact that the insurance company's fraudulent

practices were inflicted on countless customers. *Id.*

¶ 40 In the present case, State Farm's conduct seriously affected the Campbells, as indicated previously, as well as many others. In particular, State Farm's conduct corrupted its employees by forcing them to engage in deceptive practices or lose their jobs. Moreover, State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers. *Id.* Because State Farm's actions have such potentially widespread effects, this factor supports a high punitive damages award.

5. Probability of Future Recurrences

■■■ ¶ 41 This factor analyzes the likelihood that the defendant will repeat or continue engaging in its wrongful behavior. A high probability of recidivism justifies a higher than normal punitive damage award. *BMW,* 517 U.S. at 577, 116 S.Ct. 1589. In light of State Farm's decades-long policy of fraudulent and dishonest practices in its handling of claims, it is difficult to imagine how such ingrained policies of corporate culture can be easily or quickly changed. This would be true even in a case where the perpetrator was fully aware of and remorseful for its conduct. State Farm has not exhibited any such self-awareness in this case. Instead, State Farm asserted at trial that its PP & R policy was "obsoleted" in 1992 and again in 1994. However, the Campbells' evidence showed that the policy was still being followed at the time of trial. *Id.*

¶ 42 State Farm challenged the Campbells' evidence by pointing out at trial that State Farm's regional vice president for Utah testified that he had sent "peace of mind" letters to customers assuring them that State Farm would protect them against personal exposure in third-party suits. However, as the trial court noted, "[t]he Court does not find it

surprising that the jury apparently was not particularly persuaded that this repentance was genuine," especially in light of the fact that the vice president did not decide to send such letters until he "was in the office of trial counsel preparing for his trial testimony ... not long before the jury was to decide punitive damages."

¶ 43 In short, we are persuaded, as was the trial court, that "[g]iven the absence of credible evidence that, in fact, State Farm's policies have changed, and that the misconduct carried out toward Utah consumers during the past two decades has ended, the probability of recurrence of State Farm's misconduct appears extremely high."

6. Relationship of the Parties

■■■■■ ¶ 44 This factor analyzes the relationship between the parties, specifically, the degree of confidence and trust placed in the defendant. The greater the trust placed in the defendant, the more appropriate the imposition of a large punitive damage award for a breach of that trust. A breach of a fiduciary relationship also supports a large punitive damage award.

■■■ ¶ 45 In *Beck v. Farmers Ins. Exch.,* we noted that a fiduciary relationship exists between insurers and insureds like the Campbells because

> [i]n a third-party situation, the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf.... In essence, the contract itself creates a fiduciary relationship because of the trust and reliance placed in the insurer by its insured. The insured is wholly dependent upon the insurer to see that, in dealing with claims by third parties, the insured's best interests are protected.

701 P.2d 795, 799 (Utah 1985) (citations omitted). Because State Farm breached its duty in this fiduciary relationship, the trial court ruled that State Farm's actions warranted high punitive damages. *See Brown v. Coates,* 253 F.2d 36, 40 (D.C.Cir.1958) (holding that punitive damages are particularly appropriate when fiduciary duty is disregarded and exploited for gain).

¶ 46 State Farm argues that, although a fiduciary relationship exists, it *is not* an adequate basis for imposing a multi-million dollar penalty. Its argument is that because its breach of its fiduciary duty is the reason it is liable in tort in the first place, the breach cannot be "double-counted" as a justification for a large award. *Id.* at 86.

¶ 47 We disagree. The facts show that the Campbells trusted in and relied on State Farm's promises of protection and aid. For example, State Farm affirmatively promised the Campbells that it "would look out for their best interests" and that they should not procure their own counsel because State Farm would take care of them. Also, State Farm convinced the Campbells that "they had absolutely no risk," and even on the chance that they were found liable, they had adequate insurance to cover any potential liability. The Campbells relied on these promises: Inez Campbell actually transferred some of her separate property into joint ownership with her husband *after* the accident upon being told that there was no risk to Mr. Campbell of an excess judgment. The relationship of trust between State Farm and the Campbells, and the breach of that trust, warrants a substantial punitive damage award.

### 7. Ratio of Punitive to Compensatory Damages

¶ 48 As noted above, the trial court reduced the jury's punitive damage award from $145 million to $25 million based solely on this factor. State Farm argues that this number is still grossly disproportionate to the harm suffered and should be reduced further according to the *Crookston I* ratio.

¶ 49 Applying the rationale and the language of both *Crookston* cases to this case, we reject State Farm's interpretation. First, contrary to State Farm's arguments, the ratio of punitive to compensatory damages is not determinative. It is simply one of the factors to be considered, none of which is more important or conclusive than another. *See Crookston I*, 817 P.2d at 808. *Crookston I* specifically stated that: "No relative weights have been assigned them [the fac-

tors], and no standards or formulas have been established for properly evaluating them." *Id.* A large award triggers a more searching judicial analysis of the situation to ensure the defendant's conduct warrants large punitive damages. However, if the other six factors support a large punitive damages award, a judge should not decrease the amount solely because of the ratio of punitive to compensatory damages. *Crookston II*, 860 P.2d at 940.

¶ 50 Second, both *Crookston I* and *Crookston II* rejected the idea of establishing a specific ratio or capping punitive damages, and emphasized that the guidelines for punitive damages need to be flexible enough to accomplish both the punishment and deterrent purposes of punitive damages. *See Crookston II*, 860 P.2d at 941; *Crookston I*, 817 P.2d at 809. In support of this reasoning, the *Crookston II* court noted that

> [i]f a company could predict that its systematic fraudulent conduct would evade detection in many instances and on those few occasions where it was discovered, would never result in punitive damages greater than the ratios we have historically upheld, it could carefully calculate the cost/benefit ratio of its wrongful conduct and avoid the deterrent potential of punitive damages.

*Crookston II*, 860 P.2d at 941.

¶ 51 Finally, *Crookston II* itself was a case where the ratio of punitive to compensatory damages was higher than three to one. We upheld that award because of the willful, malicious, and fraudulent conduct of the insurance company towards the Crookstons and other similarly situated Utahns. *Crookston II*, 860 P.2d at 941. Since State Farm's conduct is of a similar nature, we hold that a ratio of greater than three to one is permissible here, and that the trial court erred in remitting the jury award. As long as the other factors sustain a high punitive damage award, as they do here, neither *Crookston I* nor *Crookston II* bars courts from imposing punitive damage awards greater than three times the amount of com-

pensatory damages.[9]

¶ 52 Based on the foregoing review of the seven *Crookston I* factors, we hold that, with the exception of its analysis of the seventh factor, the trial court's analysis is fully corroborated by our own. However, we conclude that the trial court erred in deciding that the seventh factor required remittitur as a matter of state law.

### B. Federal Law

¶ 53 State Farm asserts that the standards set forth in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), prohibit imposing the large amount of punitive damages awarded in this case. To "illuminate 'the character of the standard that will identify unconstitutionally excessive awards' of punitive damages," the *BMW* Court stated:

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.... States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case.... Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

*Id.* at 568, 116 S.Ct. 1589 (citations omitted). The Supreme Court then identified "[t]hree guideposts" for consideration: "[1] the degree of reprehensibility of the [conduct]; [2] the disparity between the harm or potential harm suffered ... and [the] punitive damages award; and [3] the difference between this remedy [the punitive damage award] and the ... penalties authorized or imposed in comparable cases." *Id.* at 574–575, 116 S.Ct. 1589. Since the reprehensibility guidepost of

the *BMW* test mirrors the second and third factors in *Crookston I,* relating to the nature and circumstances surrounding defendant's misconduct, we incorporate here our earlier analyses of these *Crookston I* factors, and conclude for the reasons discussed therein that the reprehensibility guidepost is met.[10] We analyze the second and third "guideposts" separately below.

### 1. Disparity Between the Harm and the Punitive Award (Ratio)

¶ 54 The most common means of determining whether a punitive damage award is excessive under federal law is to look at the ratio of punitive to compensatory damages. *See BMW,* 517 U.S. at 580, 116 S.Ct. 1589. However, when conducting such an analysis, there is no "simple mathematical formula," "categorical approach," or "constitutional line" for determining an appropriate punitive to compensatory damage ratio. *Id.* at 582, 116 S.Ct. 1589. In fact,

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* Overall, the ratio of punitive to compensatory damages needs to be reasonable considering the totality of the circumstances. *Id.* at 583; *see also TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 458–62, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (upholding punitive damage award that was 526 times amount of compensatory damage award because of potential harm that could have occurred had defendant's fraudulent scheme worked); *Pac. Mut. Life Ins. Co. v.*

---

**9.** It is worth noting that the trial court here issued a remittitur to $25 million, still twenty-five times the amount of the compensatory damages. Had the trial court complied with State Farm's interpretation of the *Crookston I* ratio factor, the remittitur would have been to an amount three times the amount of the compensatory damages—$3 million. It is apparent from the trial court's written findings that it would not have

remitted the amount at all except for its mistaken belief that the jury's award exceeded proper limits as a matter of law under *Crookston I.*

**10.** Facts relevant to other *Crookston I* factors, such as factors four and six, may also satisfy the *BMW* reprehensibility guidepost.

*Haslip,* 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (upholding punitive damage award that was 200 times amount of plaintiff's out-of-pocket expenses based on reprehensibility of conduct and wealth of defendant).

¶ 55 Based on the language cited above, the trial court found that this *BMW* factor "does not impose a rigid cap on punitive damages awards" because in the Campbells' case, as in *TXO,* "the injury is hard to detect" and the potential for large harm is substantial. Specifically, the trial court relied on the following facts to justify the high punitive damage award: (1) State Farm never reported previous punitive damage awards to headquarters, even though prior awards included a Texas judgment of $100 million; (2) State Farm is an enormous company with massive wealth; (3) State Farm's actions, because of their clandestine nature, will be punished at most in one out of every 50,000 cases as a matter of statistical probability; and (4) State Farm's policies have affected vast numbers of other Utah customers.

¶ 56 While not contesting the validity of the finding that it is likely to be punished at most in one out of 50,000 cases, State Farm does challenge the other three justifications. Because State Farm's objections to considering relative wealth and the effects on other Utah customers are identical to its arguments against the punitive damage award under *Crookston I,* we again incorporate by reference our previous analysis of *Crookston I* factors one and four in section "IA" 1 and 4 of this opinion.

¶ 57 Turning to the remaining justification relied on by the trial court, we note that the court found that a prior $100 million punitive damage award against State Farm had not been reported to its national headquarters. State Farm argues that the award in this case need not be more severe than that award, citing *Johansen v. Combustion Engineering, Inc.,* for the proposition that "a punitive award does not need to be large enough to 'make the company newsletter' and need 'not attract the attention of the board of directors' in order to have a deterrent effect." 170 F.3d 1320, 1338 & n. 36 (11th Cir.1999), *cert. denied sub nom. Com-*

*bustion Eng'g. Inc. v. McGill,* 528 U.S. 931, 120 S.Ct. 329, 145 L.Ed.2d 256 (1999). State Farm's reliance on *Johansen* is unfounded. First, unlike this case, *Johansen* did not involve punishing a company that had previously been assessed punitive damages for its illicit conduct. Rather, the punitive damage award issued in *Johansen* against the mining company was the first and only punishment imposed for its misconduct. *Id.* at 1336.

¶ 58 More importantly, State Farm misconstrues the holding of *Johansen,* which in fact stands for the proposition that larger awards are necessary for large corporations, and that company executives should be aware of imposed punitive sanctions. *See id.* at 1338–39. Specifically, *Johansen* states that

in promoting deterrence, the economic wealth of a tortfeasor may be considered. *A bigger award is needed to "attract the … attention" of a large corporation. …* It is not unlikely that having to pay … punitive damages would not make the company newsletter. *It should, however, attract the attention of whomever is in charge of the corporation's daily decisions* … and would, no doubt, bear heavily upon regional or local managers where failure to regard consequences would be expected to subject their employer to loss.

*Id.* (citations and footnotes omitted and emphasis added).

¶ 59 Many large corporations are "entities too powerful to be constrained" by remedies provided by "criminal and civil law." Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers,* 42 Am. U.L.Rev. 1269, 1329–30 & n.299 (1993). In many cases, the public's only protection against exposure to fraudulent harmful conduct by such large, powerful corporations is the threat that sanctions imposed for misconduct will be sufficiently severe. *Id.* If such a threat is unavailable, punitive damage awards against large entities will not serve their deterrent and punitive purposes. *See Crookston II,* 860 P.2d at 941.

¶ 60 State Farm points out that in the wake of *BMW,* many lower courts have held unconstitutional far lower ratios of punitive

to compensatory damages than exist here. State Farm cites eighteen cases where courts have reduced punitive damage awards after conducting a *BMW* analysis. *Id.* at 77–78. In contrast, the Campbells cite nine other cases upholding punitive damage awards where the ratio of punitive to compensatory damages is larger than or the same as the ratio in this case.

¶ 61 All the cases agree, however, that each court must analyze the facts of each case to ensure that the defendant's acts warrant the punitive damage award imposed.[11] In fact, the *BMW* court made it clear that the initial punitive damage award in that case (500 times the amount of plaintiff's damages) was not automatically invalid, but that it was unconstitutional because of the specific facts of the case—i.e. the fraud was perpetrated without "trickery or deceit," the available criminal and regulatory sanctions for comparable misconduct were minor, and some of the conduct for which BMW was being punished was legal in states other than Alabama. *BMW*, 517 U.S. at 582–84, 576–78, 572, 116 S.Ct. 1589.[12]

¶ 62 Like *BMW*, this case contains exceptional facts and circumstances. Here, however, they support a higher rather than a lower punitive damage award. State Farm's fraudulent conduct has been a consistent way of doing business for the last twenty years, directed specifically at some of society's most vulnerable groups. The likelihood of further misconduct by State Farm is great, given the fact that it has not changed its conduct despite a previous $100 million punitive damage award. Moreover, the effect on the Camp-

bells warrants a large award, given that they had to live in fear of complete financial ruin for over eighteen months because of State Farm's refusal to settle their claim. Finally, the harm propagated by State Farm is extreme when compared to the statistical probability that State Farm is likely to be required to pay damages only once in 50,000 cases. Thus, because there are reasonable justifications for the large punitive damage award based upon the specific facts of this case, the ratio factor in *BMW* does not require the award to be reduced simply because the ratio of punitive to compensatory damages is high.

2. Civil or Criminal Penalties Authorized in Comparable Cases

¶ 63 The final factor for determining whether a punitive award is excessive under federal law is to "[c]ompar[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *BMW*, 517 U.S. at 583, 116 S.Ct. 1589. Possible imprisonment for such conduct is a strong indication that the conduct warrants high punitive damages. *Id.*

¶ 64 The trial court found that this factor "does not require reduction of the punitive damage award" because the "penalties that could be imposed under Utah law for the fraudulent scheme that has been pursued by State Farm are enormous." Specifically, the trial court found that State Farm could be forced: (1) to pay a $10,000 fine for each act of fraud under Utah Code Ann. §§ 31A–26–301 *et seq.*; (2) to renounce its business

---

**11.** The de novo standard of appellate review imposed by *Cooper Industries* underscores this principle.

**12.** That courts must analyze each case's facts to determine the appropriateness of the ratio is also demonstrated by the following cases, cited by State Farm: *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 504–05 (8th Cir.1998) ("As an initial matter, the 24:1 ratio of punitive to compensatory damages is not unsettling as a matter of due process.... [However,] the nature and extent of the [defendant's] conduct does not support the jury's award [and] ... the effect on [the plaintiff] does not warrant" such an award); *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir.1998) (reducing punitive damage award only "[a]fter considering the nature and extent of the miscon-

duct, the impact on the individual plaintiffs, a reasonable relation between the compensatory and punitive damages, and an amount sufficient to punish and deter under all the circumstances"); *Utah Foam Prods. Co. v. Upjohn Co.*, 930 F.Supp. 513, 532 (D.Utah 1996) (reducing punitive damage award because, upon review of evidence at trial, "the punitive damages award does not appropriately reflect the level of Upjohn's misconduct. Decidedly, no egregious conduct was presented which would justify the amount of the award based upon clear and convincing evidence"); *Apache Corp. v. Moore*, 960 S.W.2d 746, 749 (Tex.App.1997) (noting that "the ratio that will pass constitutional muster will depend upon the facts in each case").

license or have its Utah operations dissolved under Utah Code Ann. §§ 31A–26–213, 76–3–201(2) and (3), 76–10–1602(ppp), and 76–10–1603.5(5); (3) to disgorge all the illicit profits gained by the scheme, plus pay a fine of twice the value of those profits, under Utah Code Ann. §§ 76–10–1602 *et seq.*; and (4) to publically acknowledge that its officers had been convicted of fraud under Utah Code Ann. § 76–3–303. Moreover, under Utah Code Ann. § 76–3–303, State Farm's officers could be imprisoned or removed for up to five years, an extremely important consideration for the *BMW* court. *BMW*, 517 U.S. at 584, 116 S.Ct. 1589.

■■■ ¶ 65 State Farm disputes these findings, arguing that since this case is the "only bad faith action against it in the last fifteen years," there is no evidence that it has defrauded customers or gained illicit profits. Moreover, State Farm argues that even if it could be punished for its practices, permissible punishment is limited by the "actual fining practice" of the Insurance Commission. *Id.* at 83.

¶ 66 State Farm's logic is unpersuasive for several reasons. First, such an interpretation runs contrary to the clear language of *BMW* indicating the Court was examining "the civil or criminal penalties that *could* be imposed for comparable misconduct," not other punishments already issued against the defendant. *BMW*, 517 U.S. at 583, 116 S.Ct. 1589 (emphasis added).

¶ 67 Second, State Farm's argument that there is no evidence of fraud is contrary to the trial court's findings and to the evidence that we have reviewed supporting those findings. It is difficult to understand how State Farm can argue that there is no evidence that it committed fraud or acted illicitly when the record contains volumes of such evidence. The evidence was so extensive and convincing that it took the trial court nearly twenty-

eight pages to summarize it in his findings on the post-trial motions.

¶ 68 Finally, State Farm's argument that the Insurance Commission's practices in assessing fines are applicable, rather than the maximum statutory penalties, is contrary to *BMW*. The *BMW* court clearly indicated that the punitive award was to be compared to legislatively set penalties, not administrative agency practices. *BMW*, 517 U.S. at 584, 116 S.Ct. 1589. For example, the Supreme Court stated that it was examining "the statutory fines" and "[t]he maximum civil penalty authorized by the Alabama Legislature." *Id.* Moreover, *BMW* also stated that a "reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to *legislative* judgments concerning appropriate sanctions for the conduct at issue." *Id.* at 583, 116 S.Ct. 1589 (internal quotation marks omitted and emphasis added). We conclude that the trial court correctly found that a large punitive damage award was justifiable under this third guidepost.

¶ 69 In conclusion, we hold that the trial court's analysis of the punitive damage award under *BMW* was correct. In light of the foregoing analysis of state and federal law, we vacate the trial court's remittitur order and reinstate the jury's verdict awarding $145 million in punitive damages.

## II. OTHER ACTS EVIDENCE

¶ 70 State Farm argues that large quantities of "other acts" evidence were admitted in violation of the Utah Rules of Evidence because such evidence had nothing to do with State Farm's handling of third-party claims in general, or State Farm's conduct toward the Campbells in particular, and therefore had no probative value. State Farm catalogs a long list of allegedly inadmissible evidence on which it bases its argument that the evidentiary process in the trial court was tainted.[13] In contrast, the Campbells argue that

---

**13.** In particular, State Farm argues that the following evidence was not admissible:

1. Evidence relating to first-party property claims;
2. Unsubstantiated allegations in class action lawsuits;
3. Verdicts in first-party cases;

4. Evidence of the conduct of a non-party sister company;
5. Evidence that State Farm employed predictable experts;
6. Evidence that State Farm engaged in hard ball litigation tactics;

State Farm did not properly preserve its evidentiary objections and that, even if it had, the trial court did not exceed its discretion in admitting the "other acts" evidence.

¶ 71 We decline State Farm's invitation to take a piecemeal approach to the analysis of the admissibility of the "other acts" evidence in this complex and lengthy litigation. Just as any able litigator must have a "theory of the case" if he or she hopes to convince a fact finder of the merits of a particular action, it is crucial for a trial judge confronting a case with so many issues and opportunities for mistake to have an overall view of the necessary balance for fairness to the parties in the conduct of the trial, particularly as this relates to the admission and exclusion of evidence. The trial court in this case had such a vision, and we believe it achieved balance and fairness.

¶ 72 First and foremost, the trial court granted State Farm's request, over the Campbells' strenuous objections, to take the unusual step of bifurcating the trial.[14] The trial court imposed stringent evidentiary restrictions on the Campbells during phase I of the trial, so that only State Farm's treatment of *the Campbells* was at issue in establishing its bad faith in handling their claim. *Id.* In a post-trial ruling, the trial court stated that it "understood that the purpose of [the] bifurcation order was to separate the so-called 'bad-faith phase' (phase I) from what the parties termed the 'institutional phase' of this trial (phase II)." The trial court continued: "State Farm prevailed in its bifurcation arguments largely by pointing out that phase II, covering the institutional evidence, would involve a very lengthy trial, as it would deal with State Farm's *corporate policies and practices*—so that bifurcation would save substantial resources in the event that the jury found no bad-faith claim handling." (Emphasis added.)

¶ 73 The other major decision that the trial court made, on which State Farm's arguments regarding error in the admission of "other acts" evidence largely succeed or fail, was the admission of evidence related to its PP & R policy. This policy, initiated in 1979 by the company's highest executives, set fixed ceilings on the payment of claims in order to increase corporate profits. After phase I established that State Farm had handled the Campbells' claim in bad faith and had breached its fiduciary duty to them, State Farm defended itself in phase II by claiming that its actions were only the result of an "honest mistake" or an isolated lapse in judgment. Based on this defense, the trial court denied State Farm's request to exclude all evidence from which the jury could infer that the Campbells were the victims of an extensive, intentional scheme to defraud State Farm's policyholders. All of the other categories of evidence State Farm challenges as being erroneously admitted during phase II of the trial, from the practice of office competitions to lower average claims paid, to the discriminatory treatment of insureds based on gender, race, economic status, educational background, and age, were part and parcel of its PP & R policy.

¶ 74 In this context, we conclude that we must consider the evidence in an integrated fashion and analyze whether the trial court erred in admitting the "other acts" evidence in general. State Farm's challenge to the trial court's admission of such evidence is controlled by Utah Rule of Evidence 404(b), which states:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403.

Thus, "in deciding whether evidence of other crimes is admissible under rule 404(b), the

---

7. Evidence that State Farm strongly encouraged first-contact settlements; and
8. Evidence showing that State Farm discriminated on the basis of sex and race.

14. The trial judge was actually upholding an earlier bifurcation order by predecessor Judge John Rokich.

trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirement of rule 403." *State v. Decorso,* 1999 UT 57, ¶ 20, 993 P.2d 837. When reviewing such decisions, we apply "an abuse of discretion standard . . . [and consider] the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of [his or her] discretion.' " *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 16, 6 P.3d 1120 (quoting *Decorso,* 1999 UT 57 at ¶ 18, 993 P.2d 837).

### A. Noncharacter Purpose

■ ¶ 75 "Under the first part of this analysis, the proponent must demonstrate that the evidence is actually being offered for a proper, noncharacter purpose, such as those specifically listed in . . . rule [404(b) ]." *Decorso,* 1999 UT 57 at ¶ 21, 993 P.2d 837. Although the list of noncharacter purposes found in rule 404(b) is helpful, it is not exclusive. *See* Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 4–41 (1996).

■ ¶ 76 Phase II of the trial involved the Campbells' claims of fraud, intentional infliction of emotional distress, and punitive damages, and State Farm's defense that its mistreatment of the Campbells was unintentional and simply the result of an honest mistake. In this context, the trial court found that the Campbells' evidence, which State Farm now challenges on appeal, was offered for many noncharacter purposes, including establishing State Farm's intent, reckless disregard, absence of mistake, plan, and outrageous conduct, as well as rebutting State Farm's defense. Comparing the elements necessary to establish the Campbells' claims and to rebut State Farm's defenses with the evidence State Farm finds objectionable, we conclude that the trial court was entirely correct in finding that such evidence was offered for noncharacter purposes.

Moreover, based on our review of the record, which indicates that the trial court made its conclusions only after reviewing numerous motions in limine made by State Farm and conducting at least ten pretrial hearings that consumed more than fifteen days, we are satisfied that the trial court scrupulously examined the "other acts" evidence ultimately admitted at trial. Once again, we have been greatly assisted in our review by the trial court's extended written findings in his orders on the pretrial motions. Accordingly, we conclude that the trial court did not exceed the permitted range of discretion in finding that the "other acts" evidence was offered for a proper, noncharacter purpose.[15]

### B. Rule 402

■ ¶ 77 Under rule 402, "other acts" evidence, like all evidence, must be relevant or it is not admissible. Utah R. Evid. 402 ("All relevant evidence is admissible. . . . Evidence which is not relevant is not admissible."). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Thus, to be admissible, "other acts" evidence must tend to prove some fact that is material to the cause of action alleged—other than the defendant's propensity to engage in actions in conformity therewith. *Decorso,* 1999 UT 57 at ¶ 22, 993 P.2d 837.

¶ 78 After careful consideration, the trial court specifically concluded that the "other acts" evidence to which State Farm presently objects was "relevant," "helpful," and "of high probative value" because such evidence was necessary to establish several elements of the Campbells' claims and to rebut State Farm's defenses. Our review of the record makes it clear that the trial court's statement regarding the necessity of the "other acts" evidence is amply supported therein. Notably, one of the chief concerns of rule 402 is

---

**15.** It is not entirely clear to us that the conceptual considerations related to "character" under rule 404 translate freely from the cases we have decided involving an individual's character to the "character" of a corporation. Both parties in this case have briefed the issue without any attention to potential distinctions, however, and so for purposes of this case, we assume (without deciding) that the analysis should be identical.

not even present in this case, namely the need to ensure that fact-finders will not infer wrong-doing in a present scenario because an actor has done wrong in the past. Phase I of this trial conclusively established that State Farm acted in bad faith; its wrong-doing was thus determined without *any* reliance on past deeds or general practices. The only issue in Phase II was the nature of appropriate compensatory and punitive damages to be imposed in response to the wrong-doing. For that purpose, State Farm's intent, motive, and rationale for its wrong-doing was extremely relevant, and the evidence of its long-established methods of doing business were, as the trial court found, highly probative.

¶ 79 Surprisingly, even in the face of the trial court's detailed findings and analysis, State Farm asserts on appeal that the "other acts" evidence had *no* probative value. We find this assertion troubling. State Farm's failure to acknowledge the probative value of the "other acts" evidence is of a piece with its inability to acknowledge that it engaged in a wide-spread corporate scheme to defraud its insureds, a scheme that had far-reaching negative effects on both its insureds and society in general. Because the trial court had a reasonable basis in the evidence for its decision, we reject State Farm's assertion, and conclude that the trial court did not abuse its discretion in finding evidence of State Farm's "other acts" relevant. *See Crookston II*, 860 P.2d 937, 938 (Utah 1993) ("[W]e reverse only if we find an abuse of discretion, i.e., no reasonable basis for the decision.")

### C. Rule 403 Analysis

 ¶ 80 Rule 403 requires that "we weigh the probative value of the evidence with the potential for creating prejudice in the minds of the jurors." *State v. Reed*, 2000 UT 68, ¶ 29, 8 P.3d 1025. The rule states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403. In assessing whether prior acts evidence satisfies the requirements of rule 403,

a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Reed*, 2000 UT 68 at ¶ 29, 8 P.3d 1025.

 ¶ 81 In ruling upon State Farm's various evidentiary motions, the trial court found that in light of the phase I jury verdict against State Farm, "the pattern and practice evidence is of high probative value and importance to plaintiffs' claims, and that serious prejudice to plaintiffs would result if such evidence were excluded. The court further finds that the probative value is not outweighed by the danger of unfair prejudice or confusion." The trial court made it clear, however, that it was not precluding further rule 403 objections to exclude *specific* evidence. Rather, it found only that objections to specific evidence based on the "general issues of wrongful pattern and practice evidence" would be improper.

¶ 82 We find compelling reasons under rule 403 to uphold the trial court's denial of State Farm's request to generally exclude all "other acts" evidence related to its patterns and practices. As discussed above, the alleged wide-ranging effects of State Farm's PP & R policy were crucial to the Campbells' ability to prove their fraud, intentional infliction of emotional distress, and punitive damage claims. State Farm attacks the trial court's evidentiary rulings repeatedly for allowing evidence that was "dissimilar" from the facts in the Campbells' case; this once again misses the mark. The underlying purpose of rule 403 is to assure a careful consideration of prior acts and, in the event that the evidence passes the rule 404(b) threshold, to continue to evaluate the evidence in light of its potentially prejudicial effect. Although the "similarity" language of *Reed* and earlier cases is not particularly apt in this case, we think that its general concerns were accounted for

in the trial court's reasoning underlying his determinations of the admissibility of the "other acts" evidence. State Farm's PP & R policy exposed the Campbells to an excess judgment and the accompanying risk of losing all their assets. Thus, cause and effect became very important. In other words, the relevant inquiry in phase II was: What caused the Campbells' harm? Without the evidence of State Farm's PP & R policy, and evidence of practices flowing from that policy, the Campbells would have been unable to prove the real cause of their harm. The establishment of this cause and effect link was highly dependant on the "other acts" evidence of State Farm's methods of doing business.

¶ 83 State Farm also contends that the time interval factor was not met here because some of the evidence detailed behavior remote in time. However, inasmuch as there was affirmative evidence adduced tending to show that State Farm's practices were ongoing at the time of the trial (which evidence was explicitly believed by the trial court and apparently by the jury), we find that contention without merit. In light of these considerations, the trial court did not abuse its discretion in ruling that the probative value of the "other acts" evidence was not outweighed by any potential prejudice.

### III. EXPERT TESTIMONY

¶ 84 State Farm objects that the testimony by the Campbells' experts "went far beyond the realm of permissible expert testimony, instead crossing the line into rank advocacy," and thus violated rules 702 and 703 of the Utah Rules of Evidence. Conversely, the Campbells argue that, at most, only two of State Farm's objections were preserved for appeal and that, in any case, the trial court did not commit reversible error. "It is well established that trial courts have wide discretion in determining the admissibility of expert testimony." *State v. Kelley*, 2000 UT 41, ¶ 11, 1 P.3d 546. Moreover, unless "there is a reasonable likelihood that the verdict would have been different if the trial court had [excluded] the expert testimony," we will not reverse the trial court's decision. *Steffensen v. Smith's Mgmt. Corp.*,

862 P.2d 1342, 1347 (Utah 1993). While there appears to be merit to the Campbells' argument that State Farm failed to preserve many of its objections to the experts' testimony, we deem it more efficient to analyze the substance of State Farm's challenges generally, first under rule 702, and then under rule 703.

¶ 85 To rebut State Farm's "honest mistake" defense, the Campbells called experts Stephen Prater and Gary Fye. These men were intimately acquainted with the intricacies of the insurance industry and with State Farm's practices in particular. Their qualifications as experts were not challenged by State Farm. Their testimony focused upon explaining State Farm's PP & R policy and demonstrating its far-reaching effects. State Farm now argues that much of this testimony was without foundation and was prejudicial. In particular, State Farm challenges the experts' testimony concerning the company's excess liability handbook, its failure to maintain statistics on excess verdicts, the profits it derived from improper claims handling, and the effects of its PP & R policy and related practices on the insurance industry in general. State Farm also argues that Mr. Prater impermissibly testified to legal conclusions.

¶ 86 Utah Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"[T]he question that must be posed prior to the admission of any expert evidence is whether, on balance, the evidence will be helpful to the finder of fact." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (internal quotation marks omitted). Helpfulness depends upon "whether the subject is within the knowledge or experience of the average individual." *Id.* However, "[i]t is not necessary that the subject of the testimony be so erudite or arcane that the jurors could not possibly understand it without the aid of expert testimony, nor is it a requirement that

the subject be beyond the comprehension of each and every juror." *Id.* "This 'helpfulness standard' also implicates Rule 403 considerations, since if the evidence is confusing or unfairly prejudicial it will hinder rather than aid jury decision making." Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 7–9 (1996) (clarifying that "Rule 403 is not being applied directly, so . . . the question is 'helpfulness,' not whether the probative value is greatly outweighed by confusion or prejudice"); *see also Larsen,* 865 P.2d at 1363 n. 12; *State v. Rimmasch,* 775 P.2d 388, 398 n. 8 (Utah 1989). We have reviewed the entire transcript of both Prater's and Fye's trial testimony. With the exception of the argument concerning legal conclusions, we find it unnecessary to address with particularity State Farm's specific challenges.

¶ 87 That the experts' testimony was helpful is evident. State Farm conceded the witness' qualifications. Although the rule does not require that the issue to which an expert testifies be arcane, the issues raised in this case were in fact quite difficult for the average person to understand. The experts' familiarity with the insurance industry in general, and State Farm in particular, must have greatly aided the jury's understanding of the issues. Moreover, our review of the record satisfies us that the experts' testimony, given its relevance and its helpfulness, did not raise any concerns under rule 403 sufficient to warrant exclusion. Thus, because the experts' testimony was helpful to the jury, the trial court did not abuse its discretion under rule 702.

¶ 88 We now turn to State Farm's specific challenge under rule 702 which argues that Prater usurped the trial court's role of instructing the jury by impermissibly offering legal conclusions while testifying. Most of State Farm's objections address Prater's testimony concerning industry standards. In several instances he described "duties" and "standards" of behavior or of "care" that should dictate the practice of insurance companies generally. In every instance, and sometimes following objections by State Farm, it was made very clear to the jury by the phrasing of the question and/or by comments from counsel and the court,

that the witness was testifying only to prevailing standards of conduct in the industry, and not to legal standards or rules of law. In at least one instance, the trial court clarified for the jury the role of the court in instructing them on the law, the limited role of the experts, and properly instructed the jury at the end of the trial. The trial court did not abuse its discretion in permitting the testimony in question.

¶ 89 Finally, State Farm objects because Prater pointed to boxes of documents in the courtroom and testified that those documents supported his conclusion that State Farm engaged in a pattern of cheating on claims. This challenge is governed by rule 703, which states

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This court has held

> "[O]nce the expert is qualified by the court, the witness may base his [or her] opinion on reports, writings, or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field. The opposing party may challenge the suitability or reliability of such materials on *cross-examination,* but such challenge goes to the *weight* to be given the testimony, not to its admissibility."

*Patey v. Lainhart,* 1999 UT 31, ¶ 30, 977 P.2d 1193 (quoting *State v. Clayton,* 646 P.2d 723, 725 (Utah 1982)) (emphasis added). The policy behind the current iteration of this rule is aimed at broadening the permissible bases of expert opinion. One justification driving this policy is to lessen " 'the expenditure of substantial time in producing and examining various authenticating witnesses.' " *Id.* (quoting note of advisory committee to federal version of rule 703, which is identical to Utah's rule 703).

¶ 90 Applying rule 703, we find that Prater's testimony concerning the documents were not improper because such documents were "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Utah R. Evid. 703; *see also Am. Concept Ins. Co. v. Lochhead,* 751 P.2d 271, 274 (Utah Ct.App.1988) (finding that expert in licensed property and casualty claims properly relied upon his examination of adjuster's file, since this was "material[ ] of a type usually relied upon by experts in his field").

¶ 91 Prater described the nature of the documents in his files, the means by which he had obtained them, and the fact that he had reviewed and was familiar with their contents. He testified that the vast majority of the documents were original State Farm documents or copies thereof. He further testified that his conclusions and opinions in this trial were based in part on his study of the documents.

¶ 92 State Farm complains that cross-examining Prater on these documents would have entailed more time than it was allotted for trial. In our view, however, extra time was not the issue. Cross-examination of Prater on the documents in the boxes was not a relevant task for State Farm. On the contrary, State Farm had a duty to locate and produce documents critical to challenging Prater's testimony and to conduct an effective cross-examination within the known time constraints. Because State Farm had itself produced most of the documents, we presume (as did the trial judge) that it knew their contents. It cannot now claim error because its own trial strategy did not produce favorable results.[16] Accordingly, we find that the trial court did not abuse its discretion in admitting Prater's testimony.

## IV. SETTLEMENT AGREEMENT

¶ 93 As described briefly in the background portion of this opinion, Slusher and Ospital entered into a settlement agreement prior to the trial of the initial lawsuit in Logan, Utah, to determine liability in the underlying accident. Their agreement was reflected in two separate documents, both dated June 3, 1983. In the first, entitled "Release of Claims," Slusher accepted $65,000 in return for a release of all claims against Ospital and Ospital's insurers. The release expressly preserved Slusher's claims against Campbell and his insurers (who were in any event not parties to the release). The second agreement, which we will refer to as the Bad Faith Agreement, required Ospital to "assist Slusher in the prosecution of his claim against any other party responsible for said injuries and damages, including any claim for bad faith against any insurer of the responsible party." It specifically required Ospital to remain as a party in the Logan case (in which Ospital had a cross-claim against Campbell in addition to Slusher's claims against Campbell) and provided for some sharing of any recovery over and above Slusher's damages as determined by the jury in that case. *Id.*

¶ 94 In the Logan trial and in both phase I and phase II of the trial at issue in this appeal, State Farm sought admission of the details of that agreement in evidence. State Farm's theory on all three occasions was that, because the settlement required Ospital to remain in the original lawsuit, Ospital and Slusher were permitted to "gang up" on Campbell in the liability determination process. State Farm wished to rely on the agreement as evidence of "collusion" in the Logan trial, which it wanted to argue to the jury in this trial had increased the severity of the liability percentage assigned to Campbell in the original lawsuit, and should therefore mitigate the evidence of bad faith in phase I and support its theory of "innocent mistake" in phase II. The trial judge rejected State Farm's rationale and precluded use of the settlement agreement. We agree with the trial judge.

¶ 95 The record in this case establishes that State Farm was informed, prior to the

---

**16.** Additionally, we note that the trial court was very responsive to State Farm's request for additional time when it claimed the necessity of adding rebuttal witnesses regarding a different aspect of the trial. In fact, at that juncture, the trial court doubled the amount of trial time allotted. We are confident that the trial court would have done the same had State Farm convincingly presented such a need regarding these documents.

Logan lawsuit, that Slusher would seek a unilateral settlement with Ospital if State Farm continued to refuse to participate in a settlement. On the day the Logan trial began, counsel for Slusher told the trial court and State Farm counsel that the terms of the agreement included, in addition to a release of Slusher's claims against Ospital in return for a payment of $65,000, "cooperation" between Slusher and Ospital in the event of a future bad faith action against State Farm. State Farm's counsel immediately informed the trial court that he feared collusion at trial between Ospital and Slusher to place blame for the accident on Campbell. The trial court declined to admit evidence of the settlement agreement.

¶ 96 After verdict in the Logan trial, the trial court, on Campbell's motion for a new trial, explained at length its rationale for excluding the liability release agreement from the trial. The court's memorandum decision observed specifically that Campbell's counsel had requested admission of this agreement and an instruction to the jury that "Ospital and Slusher were no longer in an adversary position with one another," and that he would be "facing the position where counsel for Ospital and Slusher were in collusion against Campbell and the way they could now conduct trial would affect the outcome to the prejudice of Campbell." This is of course exactly the argument State Farm now raises about the Bad Faith Agreement (the basic terms of which had been disclosed at the outset of the liability trial even though it was not shown to the court or counsel). Responding to that argument, the trial judge wrote:

> As to any collusion, this Court was present and observed the whole trial, observed no collusion between attorneys for Ospital and Slusher. In fact, Counsel for Slusher questioned all witnesses of both Campbell and Ospital as though adversary to his position that Slusher was not negligent, had no liability, and that he didn't know who was liable but it had to be one or the other defendant or both.

Memorandum Decision November 22, 1983

¶ 97 After reading the Bad Faith Agreement in its entirety for the first time, the trial court subsequently took the extraordinary step of executing an affidavit in May of 1996, containing the following assertions:

> 6. ... I do not believe the second agreement [the Bad Faith Agreement] posed any risks or caused any alteration of the parties' positions at trial different from those already created by the first agreement [the Release of Claims].
>
> 7. Because of my awareness of the first agreement during the trial, I was careful to watch for any signs of improper collusion or other improper conduct by Slusher, Ospitals or their counsel at trial. I saw no such conduct. I also saw no signs of efforts by Slusher, Ospitals or their counsel to work together to gain unfair advantage over Campbell and his counsel.
>
> 8. The statements and finding I made after the trial in the Memorandum decision issued in November, 1983 ... were and are accurate.

¶ 98 This court, on appeal of the Logan verdict in *Slusher v. Ospital*, 777 P.2d 437, 438 (Utah 1989), concluded that the trial court erred in not "disclosing the settlement" to the jury. After analysis of the totality of circumstances at trial, however, we held that "the disclosure of the settlement agreement to the jury would not have had any effect on the outcome of trial." *Id.* at 445. While our reference to "the settlement agreement" arguably referred only to the Release of Claim document, there is nothing in the separate Bad Faith Agreement that would have differently affected the incentives of the parties or probabilities of collusion between Ospital and Slusher at trial.

¶ 99 Thus, the existence and/or prejudicial effect of alleged collusion between Ospital and Slusher at the Logan trial was effectively raised and decided in that case. Furthermore, State Farm explicitly disavowed in phase I of this trial any intent to rely on an argument that it had been the target of collusion in the Logan trial. It stipulated to the exclusion of the settlement evidence in phase I and cannot now complain of the trial judge's ruling in that regard.

 ¶ 100 As to phase II, the trial court relied on rule 403 of the Utah Rules of Evidence to exclude the settlement agreement, finding that it had "little, if any, pro-

bative value," and "any probative value it may have is far outweighed by the unfair prejudice to plaintiffs that would result and the danger of confusion of the issues and misleading the jury." It having been conclusively established in the liability trial and subsequent appeal that there was in fact *no* evidence of actual collusion at the Logan trial, the settlement agreement between Slusher and Ospital simply had no relevance to the claims of Campbell against State Farm, and the trial judge was entirely correct in precluding its admission.[17]

## V. MRS. CAMPBELL'S FRAUD CLAIM

¶ 101 State Farm argues that there was no basis for the jury to find by clear and con-

vincing evidence that State Farm had an intent to defraud Mrs. Campbell. When considering challenges to jury verdicts based on insufficiency of the evidence, "we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 467 (Utah 1996) (internal quotation marks omitted). "If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm." *Steenblik v. Lichfield*, 906 P.2d 872, 875 (Utah 1995).

¶ 102 "To demonstrate that the evidence is insufficient to support the jury

---

17. Oddly, despite the trial court's ruling on this issue, the jury did in fact see the Bad Faith Agreement in phase II. State Farm's counsel conducted the following inquiry of Campbells' expert James Crandall:

Q: ... Just before the lunch break, I was asking you about your awareness through the documentation of an agreement in June of 1983 between Mr. Ospital, or the Ospitals, and Mr. Slusher about suing State Farm if they got an excess verdict.
A: Okay.
Q: And you're aware of that?
A: I have a general recollection of it.
Q: *We have this document already in evidence, and it's on June 3rd of 1983, between Robert Slusher, Junior, and the estate of Todd Ospital and Allstate.* And it said, it says here that, "Ospital and the attorneys currently retained by Ospital shall assist Slusher in the prosecution of his claim against any other party responsible for said injuries and damages, including any claim for bad faith against any insurer of the responsible party." Do you see that?
A: Yes.
Q: So before the case went to verdict, which was September of '83, Ospitals and Slushers agreed that they would go together and sue *State Farm for bad faith.*
A: Under certain circumstances. They agreed to settle as between each other, which is common, and under certain circumstances, to proceed further.
Q: But the important thing is, you're aware, as a law professor, that Ospital and Slusher didn't have a direct right to sue State Farm.
A: That's right. Not for the bad faith claim, that's right. Because it only runs to the Campbells.
Q: So when Ospital and Slusher got excess verdicts against Mr. Campbell, they needed Mr. Campbell to be the party to bring the lawsuit.
(Emphasis added).

Thus, the Bad Faith Agreement was admitted into evidence, and the jury was informed of its provisions. It came in without objection as Exhibit 41 during the cross-examination of Paul Brinkman, a witness for the plaintiffs, and its pertinent terms were read to the jury. After a subsequent objection by plaintiffs, based on the trial court's exclusion of the agreement in the pretrial motion in limine, State Farm agreed to the withdrawal of Exhibit 41; nevertheless, counsel for State Farm referenced the agreement in closing argument:

So they confirm that again and then in June of 1983, couple of weeks later, the agreement is signed on June 3rd, 1983, where Slusher, the Ospitals, their counsel and Allstate agree down here in paragraph three that they're going to assist in prosecuting a claim for bad faith against any insurer of the responsible party. And then you get down to paragraph four and they set out how this is going to happen, how this is going to work. And when you go over to paragraph four on page two they talk about splitting up the excess recovery half and half with respect to any general and punitive damages recovered in a bad-faith claim.

Now, this is an agreement, ladies and gentlemen of the jury, a contract, I guess you could call it, whereby Ospital and the Slushers agreed to pursue a bad-faith action against State Farm, which they couldn't pursue without Mr. Campbell giving them some kind of cooperation because by law they can't pursue it.

. . . .

And so what we have is a situation where the evidence shows that even before trial there was an agreement to pursue a bad-faith action by parties who can't pursue it without Campbell helping them. And I submit to you that for that agreement to be carried out, no execution could be pursued and there was no intent to ever do that.

verdict, the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *Crookston I,* 817 P.2d 789, 799 (Utah 1991). Comparing the evidence State Farm marshals in its opening and reply briefs to the evidence the trial court summarizes in its order denying State Farm's motions for a judgment notwithstanding the verdict and a new trial regarding Mrs. Campbell's fraud claim, it is clear that all State Farm has done in this appeal is to "argue selected evidence favorable to its position." *Id.* at 800. As we held in *Crookston I,* "[t]hat does not begin to meet the marshalling burden [State Farm] must carry." *Id.* State Farm's failure to meet its marshalling burden is "grounds to reject [its] attack on the fraud finding." *Id.*

¶ 103 The entirety of State Farm's summary of the evidence is contained in one paragraph of its brief. By contrast, the jury, having listened to weeks of trial testimony, and having been properly instructed on the elements of fraud, found in favor of both plaintiffs. Furthermore, in its Order Denying State Farm's Motions for Judgment NOV and New Trial Regarding Fraud, the trial judge noted: "The evidence at trial supporting each of the elements of fraud is extensive, and it is not practical to set forth all of the evidence in this Order. However, the following summary highlights some of the evidence." There follow in the Order fourteen paragraphs (four-and-a-half pages) of factual summary detailing the fraud evidence. The summary ends with this paragraph:

> n. Most of the misrepresentations and non-disclosures were also made to Inez Campbell, with the intent that Mrs. Campbell would rely thereon, which she did. Even where misrepresentations were made only to Mr. Campbell, it was apparent that they would be passed on to and relied upon by Mrs. Campbell. The evidence also established that Mrs. Campbell was present with her husband, Curtis, when Wendell Bennett misrepresented that there was no need to hire separate counsel. Mr. Campbell testified that he

would gladly have hired personal counsel if he had known of a risk of an excess judgment. There was ample evidence that the Campbells were working together in making decisions in the case, that Mrs. Campbell had strong influence on Curtis Campbell's decisions with respect to the case, and that had she appreciated that there was a substantial likelihood of losing the case, she would have insisted that it be settled and she would have had a terrific bearing on Curtis' demanding that the case be settled. There is ample evidence that the misrepresentations made in Mrs. Campbells' presence induced her inaction, to her detriment. Accordingly, there is ample evidence to support a claim of fraud by Mrs. Campbell.

¶ 104 We conclude that State Farm has entirely failed to meet its burden of marshalling the evidence on its challenge to the finding of fraud against Mrs. Campbell, and we sustain the jury's verdict and the trial court's denial of a judgment notwithstanding the verdict and a new trial.

¶ 105 The trial court limited the judgment on the fraud count to $911.25, which the Campbells paid in attorney fees after the original verdict and which was the total pecuniary loss suffered by plaintiffs. It relied in doing so on *Turner v. Gen. Adjustment Bureau, Inc.,* 832 P.2d 62 (Utah Ct. App.1992), *cert. denied,* 843 P.2d 1042 (Utah 1992), which held that a fraud claim may not support emotional distress damages because fraud is an economic and not a dignitary tort. *Id.* at 68. We disagree with the holding in *Turner,* as is reflected by our opinion in *Crookston v. Fire Ins. Exch.,* 817 P.2d 789 (Utah 1991), where we held that "all damages awarded by the jury can be sustained upon the finding of fraud." *Id.* at 798. We note that there is scholarly and caselaw support for this view that was apparently not considered when *Turner* was decided. *See Nelson v. Progressive Corp.,* 976 P.2d 859, 867–68 (Alaska 1999) (holding that emotional distress damages are permitted under fraud theory if severe damages); *Kilduff v. Adams, Inc.,* 219 Conn. 314, 593 A.2d 478, 484–85 (1991) ("[W]e concur with those jurisdictions

that allow the recovery of emotional damages that are the natural and proximate result of fraud."); *Osbourne v. Capital City Mort. Corp.*, 667 A.2d 1321, 1328 (D.C.1995) ("We hold that, upon proof of intentional misrepresentation, a plaintiff may recover 'emotional damages that are the natural and proximate result' of the defendant's conduct." (citation omitted)); Andrew L. Merritt, *Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society*, 42 Vand. L.Rev. 1, 10–12, 23–32 (1989) ("[A]s a general rule, emotional distress damages should be awarded in fraud actions.").

¶ 106 We therefore overturn *Turner*'s holding on the availability of general and emotional distress damages for fraud. In light of *Crookston I* and in view of the fact that we may sustain a trial court on a ground not relied on by the trial court, *see Bill Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120 (Utah 1984) (citations omitted), we affirm not only the pecuniary damages assessed in this case, but also Mrs. Campbell's general damages, as well as the punitive damages, on the basis of the fraud verdict.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS

¶ 107 Once again, on this issue State Farm failed in its brief to adequately marshal the evidence, and its challenge is subject to rejection on that ground alone. Furthermore, it must be rejected on its merits.

██ ¶ 108 To sustain a cause of action for the intentional infliction of emotional distress, a party "must show that (i) the conduct complained of was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality; (ii) [the defendant] intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (iii) [the plaintiff] suffered severe emotional distress; and (iv) [the defendant's] conduct proximately caused [the] emotional distress." *Retherford v. AT & T Comm. of the Mountain States, Inc.*, 844 P.2d 949, 970–71 (Utah 1992).

¶ 109 First, State Farm challenges the jury's finding of intentional infliction of emotional distress claiming that the evidence was "exceedingly weak" and that the Campbells "failed to establish that they suffered *severe* emotional distress." When considering such challenges, "we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 467 (Utah 1996) (internal quotation marks omitted). "If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm." *Steenblik v. Lichfield*, 906 P.2d 872, 875 (Utah 1995).

██ ¶ 110 In discussing when the statute of limitations begins to run for the claim of the intentional infliction of emotional distress, this court stated:

> [T]he element of emotional distress is *specific to the plaintiff in each case*. Because the tort of intentional infliction of emotional distress requires actual emotional distress, see Restatement (Second) of Torts § 46(1) (1965), this element is to be gauged *subjectively*. A particularly hardy or calloused plaintiff may never accrue a cause of action for intentional infliction of emotional distress, even though he or she is subjected to outrageous conduct that no reasonable person could be expected to bear. Consequently, our task is to determine when . . . [plaintiff] experienced severe emotional distress, not when an ordinarily sensitive person would have experienced such suffering.

*Retherford*, 844 P.2d at 975–76 (footnote omitted) (emphasis added). Thus, the Campbells must only show that they *subjectively* experienced severe emotional distress regarding the situation they found themselves in, not that an "ordinary reasonable person" would have experienced it that way. State Farm's citation to cases involving the *negligent* infliction of emotional distress for the proposition that objective proof is required to show that mental or physical consequences have occurred is inapposite. *See Harnicher v. Univ. of Utah Med. Ctr.*, 962 P.2d 67, 70–72 (Utah 1998); *Hansen v. Mountain Fuel*

*Supply Co.,* 858 P.2d 970, 973–75 (Utah 1993).

¶ 111 Second, State Farm argues that the general damages award for each of the Campbells was excessive. For an award of compensatory damages regarding the intentional infliction of emotional distress, the standard of review confronting State Farm is quite high. This court has stated:

> While it is true ... that soft compensatory damages, i.e., for pain and suffering, must be awarded with caution, "when the determination of the jury has been submitted to the scrutiny and judgment of the trial judge, his [or her] action thereon should be regarded as giving further solidarity to the judgment." *Elkington v. Foust,* 618 P.2d 37, 41 (Utah 1980). Or, as we said in *Geary v. Cain,* 255 P. at 423, 69 Utah at 358, "In case of doubt, the deliberate action of the trial court should prevail. Otherwise, this court will sooner or later find itself usurping the functions of both the jury and the trial court." *Id.* These statements in *Elkington* and *Geary* are consistent with our statement of the appropriate appellate standard of review today.

*Crookston I,* 817 P.2d at 806. Despite the court noting in *Crookston I* that the trial judge's "statements could have been more specific," it found them adequate to support its decision to uphold the compensatory damage award, and therefore to support its denial of a new trial on the issue of compensatory damages. *Id.*

■ ¶ 112 There is ample evidence in this record from which a jury could infer that each of the Campbells suffered severe emotional distress. These include: the financial ruin that they believed they faced after the jury in the underlying action rendered its verdict for more than five times the State Farm policy limit; being told by their lawyer that they could start dealing with their exposure by putting a "For Sale" sign on their house; State Farm's refusal to post a supersedeas bond to protect their home and other assets during the pendency of the appeal; and the numerous personal issues that made the Campbells, who had each experienced other traumatic events in their lives, particularly vulnerable to the stress created by State Farm's actions.[18]

■ ¶ 113 Furthermore, with respect to the amount of the award, we note that the trial court did remit the amount of compensatory damages from $1,400,000 for Curtis Campbell and $1,200,000 for Inez Campbell to $600,000 and $400,000, respectively. It might be argued, given the subjective standard enunciated by this court, that the trial court should not have so drastically reduced the jury's initial awards. The Campbells, however, do not raise this issue on appeal. As pointed out above, the deferential nature of our review requires us to uphold a jury's verdict that has been scrutinized by a trial court unless there is a clear abuse of discretion. Our review of the trial court's posttrial ruling on this issue reveals no such abuse. Therefore, we find that the award was not excessive, and note that it provides an independent basis for sustaining all of Mrs. Campbell's damages. *See* Part V, *supra,* and *Crookston I,* 817 P.2d at 798 ("[A]ll damages awarded by the jury can be sustained upon the finding of fraud."); *see also Osbourne,* 667 A.2d at 1328 (holding that plaintiff may recover emotional damages that are natural and proximate result of defendant's intentional misrepresentation).

## VII. MRS. CAMPBELL'S STANDING TO SUE FOR BAD FAITH

■ ¶ 114 In view of our holding that the jury verdicts on fraud and intentional infliction of emotional distress should be sustained, and that they independently support

---

**18.** Recently, we decided *Schuurman v. Shingleton,* 2001 UT 52, 26 P.3d 227, in which we held that "the alleged suffering that plaintiff has undergone in this case [severe pain and suffering and emotional distress] is not the type of distress that no reasonable person could be expected to endure." *Id.* at ¶ 25. We noted that plaintiff's alleged distress in that case was "indistinguishable from that commonly suffered by others when an intimate personal relationship fails." *Id.*

In this case, however, no reasonable person should be expected to endure the distress suffered by the Campbells at the hands of their insurer, in which they were led to believe they would lose their home and assets and be unable to enjoy their retirement, for which they had worked their entire lives.

all of the damages awarded in this case, *see* Parts V and VI, *supra; Crookston I,* 817 P.2d at 798; *Osbourne,* 667 A.2d at 1328, we need not address the question of Mrs. Campbell's right to sue State Farm for breach of the covenant of good faith and fair dealing. Notwithstanding the dissent's lengthy advisory opinion on the subject, the question of standing on these facts remains an open question in Utah, awaiting attention from this court in a future case. The dissent apparently offers its views in support of its conclusion that the jury's verdict on damages was somehow prejudiced by having the bad faith claim intermingled with the fraud and intentional infliction of emotional distress claims. We conclude that this notion is entirely inconsistent with the record and the jury's verdict below. This jury responded to the factual conduct of State Farm, and, in our view, rightly so. Whether the basis for recovery bore the label of "bad faith," "fraud," or "intentional infliction of emotional distress," it was the same behavior by State Farm that the jury clearly intended to compensate for and to punish. We do not believe the jury was at all affected in its decision and verdict by the legal labels applied to describe the conduct. Thus, even if the dissent were correct in its view on this question, any error would have been harmless in its effect on damages.

¶ 115 In addition, we do not agree with the dissent that "the punitive damages award must fail because it was awarded jointly to Mr. and Mrs. Campbell rather than separately to each plaintiff." Punitive damages, "are, by nature, not to compensate but to punish and deter future egregious conduct." *Crookston I,* 817 P.2d 789, 807 (Utah 1991). Therefore, the award of punitive damages is determined by the defendant's conduct and need not be separated as to plaintiff. The dissent cites *Crookston I,* 817 P.2d 789 (Utah 1991) for its claim that the punitive damages award should be remanded "due to its joint nature." *Crookston I,* however, does not support this proposition. In *Crookston I,* we reviewed the issue of whether punitive damages were excessive under the circumstances of that case. *Id.* at 793–94. The joint nature of the punitive damages award was never questioned. *Id.* at 811–12.

¶ 116 Furthermore, we do not believe that State Farm was prejudiced by the jury instructions, which referred to the Campbells jointly. The only case cited by the dissent in support of this assertion is *Nielsen v. Pioneer Valley Hospital,* 830 P.2d 270 (Utah 1992). That case, however, involved only one plaintiff and says nothing about separating plaintiffs in jury instructions. Rather, the instructions in *Nielsen* were erroneous because separate instructions were contradictory with regard to two alternate legal theories presented by plaintiff. *See id.* at 274. The instructions were faulty because the two theories required conflicting standards, and the jury could have found defendant liable on either theory. *See id.* In this case, there was no danger, as the dissent claims, of misperception that Mrs. Campbell's claims were "caused by [ ] State Farm's actions toward Mr. Campbell." As stated previously, the jury clearly awarded punitive damages based on State Farm's egregious conduct toward both Mr. and Mrs. Campbell. Just as we do not believe the jury's decision and verdict were affected by the legal labels applied to State Farm's conduct, neither do we believe that referring to the Campbells in the aggregate in the jury instructions had any effect on the damages awarded.

¶ 117 Finally, we note that the dissent has developed and espoused a theory requiring reversal in this case that was not raised below, briefed by the parties, or raised in oral argument before this court. That theory appears to rely on what the dissent terms a "faulty verdict" in phase I of the trial below, a verdict in favor of both plaintiffs. That verdict was not challenged at the time of its entry nor was it raised in this appeal. Our review of the record and of the briefs in this appeal demonstrate that the wording of the verdict was never mentioned or relied on as a ground for claimed error. It is a well-established rule that we will not reverse a trial court on the basis of claims and arguments not raised below, let alone those not even argued on appeal.[19]

## VIII. ATTORNEY FEES

¶ 118 In its challenge to the trial court's award of attorney fees, State Farm raises two arguments. First, State Farm argues that fee shifting is not available under Utah law in third-party bad faith cases. Second, State Farm argues that even if some award of attorney fees is permissible in third-party cases, the amount awarded by the trial court is grossly inappropriate. We address each argument separately below.

### A. Fee Shifting in Third–Party Cases

¶ 119 Whether attorney fees should be awarded in a particular case is a question of law reviewed for correctness. *Valcarce v. Fitzgerald*, 961 P.2d 305, 315 (Utah 1998). "The general rule in Utah, and ... the traditional American rule, subject to certain exceptions, is that attorney fees cannot be recovered by a prevailing party unless a statute or contract authorizes such an award." *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 782 (Utah 1994). Because the Campbells do not argue here, nor did they below, that a statute or contract authorizes them to recover attorney fees, we turn our analysis to the "certain exceptions" to the general rule.

¶ 120 Under Utah law, plaintiffs may recover attorney fees if they are successful in pursuing a first-party bad faith suit against their insurer. *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 468 (Utah 1996). Such actions fall within the rule that the damages available to plaintiffs "include both general damages, *i.e.*, those flowing naturally from the breach, and consequential damages, *i.e.*, those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). The rationale behind allowing recovery of both general and consequential damages in first-party, bad faith actions is "to remove any incentive for insurers to

breach the duty of good faith by expanding their exposure to damages caused by such a breach beyond the predictable fixed dollar amount of coverage provided by the policy." *Billings*, 918 P.2d at 466. Consequential damages in first-party bad faith actions can be awarded for such things as attorney fees, loss of a home or business, damages flowing from bankruptcy, and mental anguish, provided such damages are foreseeable. *Id.* at 468; *Beck*, 701 P.2d at 802.

¶ 121 Extending the rationale advanced in the first-party bad faith cases to the third-party bad faith case before it, the trial court concluded that attorney fees should likewise be recoverable. The trial court offered the following in support of its conclusion:

a. An award of attorney's fees ... removes some of the incentive for an insurer to breach the duty of good faith and fair dealing.

b. Such an award encourages insurers to act reasonably.

c. The award of "actual" attorney's fees is designed to assist in fully compensating the insured for the damages caused by the breach of good faith duties, whether such good faith duties arise from a first-party or a third-party situation.

d. For purposes of this issue, there is no reasonable basis to distinguish an insured's damages incurred in a first-party or third-party context[.]

e. The duties of good faith arising in a third-party context include fiduciary duties and are higher duties than the duties arising under the contract theory in a first-party context.

(Citations omitted.) Because we agree with the trial court's analysis, we affirm its conclusion that plaintiffs can recover foreseeable attorney fees if they successfully pursue a third-party bad faith action against their insurer. Although the foreseeability of damages test is generally limited to the contrac-

---

19. It is of course true, as the dissent notes, that State Farm argued the issue of Mrs. Campbell's standing to sue for bad faith in Point IV. A of its appellate brief. It did not, however, challenge the phase I verdict in favor of Mrs. Campbell on the fraud and intentional infliction of emotional distress claims on the same basis, since those claims were based in tort, not contract.

tual realm, we note that its use to determine damages in the context of tortious third-party, bad faith claims is justified since such "claims arise only because of the contractual relationship of the parties." *Savage v. Educators Ins. Co.,* 908 P.2d 862, 866 (Utah 1995) (holding that employee who had no contractual relationship with employer's workers' compensation insurance carrier could not sue carrier for breach of the covenant of good faith and fair dealing since such actions are predicated upon parties' contractual relationship).[20]

¶ 122 Finally, we note that the existence of a fiduciary relationship between insurers and insureds in the context of third-party bad faith claims, which we recognized in *Beck,* supports an exception to the general rule that attorney fees are not recoverable in tort actions. State Farm relies on a 1996 Colorado case, *Bernhard v. Farmers Ins. Exch.,* 915 P.2d 1285 (Colo.1996), holding that such fees are not recoverable. However, *Bernhard* clearly recognized that "[a]ttorney fees may be recoverable in an action for breach of fiduciary duty as a recognized exception to the American rule." *Id.* at 1289 (citations omitted). The Colorado Supreme Court, however, concluded that insurers were only "quasi," and not "true," fiduciaries, and thus declined to apply the exception. We disagree with *Bernhard's* view of the relationship, which is contrary to the Utah position. We do, however, accept its assertion that breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally. We thus conclude that the trial court correctly held attorney fees to be a proper element of damages in this case.

¶ 123 Thus, the issue becomes whether, at the time State Farm issued the policy to the Campbells, State Farm could reasonably foresee that if a claim arose against it the Campbells would incur attorney fees in pursuing that claim. Review of the transcript discloses that, at a minimum, State Farm's Claims Vice–President, Frank Haynes, knew that insureds pursuing claims against State Farm typically retained attorneys on a contingency fee basis. Based on this, we hold that an award of attorney fees to the Campbells was indeed foreseeable by State Farm.

### B. Amount of Attorney Fees Award to the Campbells

¶ 124 State Farm argues that the trial court erred in awarding the Campbells attorney fees equal to 40% of the compensatory damages award. Instead, State Farm suggests that the attorney fees awarded, if any, should be limited to $911.25, the amount the Campbells paid to its attorneys to obtain the benefits due them under the policy. Resolution of this issue requires application of the foreseeability test discussed in the previous section. In other words, could State Farm reasonably foresee that the Campbells would agree to a contingency attorney fee of 40% of the amount recovered for compensatory damages if they found it necessary to hire counsel to pursue a claim against State Farm?

¶ 125 At the hearing on the Campbells' motion for a directed verdict, the trial court concluded that such a fee agreement was foreseeable to State Farm. A trial court's conclusion as to what constitutes a reasonable attorney fee award is reviewed for an abuse of discretion. *Valcarce v. Fitzgerald,* 961 P.2d 305, 315 (Utah 1998). The record contains ample support for the trial court's conclusion. Perhaps most telling was State Farm's failure to present any evidence that it could not have foreseen that the Campbells would incur a contingency fee, combined with specific evidence from Vice President Haynes that contingency fees of up to 50% were common in suits by insureds

---

20. In *Gibbs M. Smith, Inc. v. United States Fidelity & Guaranty Co.,* 949 P.2d 337, 344 (Utah 1997), this court implied the same result we reach here, by holding, in a third-party claim, that attorney fees were recoverable for a breach of the implied covenant of good faith and fair dealing. Although the court observed that "a more accurate statement might be that this is a first-party action for third-party coverage," it is plain on the facts that the action involved what we described in *Beck* as a third-party claim. Thus our holding in that case, despite its scant analysis, stands for the proposition that fees are awardable in third-party bad faith claims by an insured against its insurer, a ruling we make explicit today.

against State Farm. Moreover, the Campbells presented evidence through several witnesses that contingency fees like this one have been around for decades, are well-known, and are in fact the most likely form of attorney fee arrangement, especially in a bad faith case against an insurance company. Such evidence is similar to that presented in *Billings*, where we found that the plaintiff's contingency fee arrangement was foreseeable. *Billings*, 918 P.2d at 468. Therefore, we affirm the trial court's finding that the contingency fee agreement was foreseeable and uphold its award of attorney fees in the amount of 40% of the total compensatory damages, or $400,834.70 plus 40% of post-judgment interest on the principal amount of compensatory damages.[21]

## IX. LITIGATION EXPENSES

¶ 126 Finally, State Farm argues that the trial court's award of litigation expenses was manifestly unreasonable. According to its statement of the issue, State Farm challenges the legitimacy of any award for litigation expenses, as well as the actual amount awarded by the trial court.[22]

¶ 127 As to the legitimacy of an award of litigation expenses in a case, like this, where an insurer has breached its good-faith duties to pay third-party claims, we are asked to settle a question of law, and therefore review the trial courts' ruling for correctness. State Farm relies on the distinc-

tion this court made in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985) between first-party insurance claims, sounding in contract, and third-party claims, on which a tort action may be brought. It then argues that, like attorney fees, litigation expenses may not be awarded as damages in a tort action. For the same reasons detailed in the previous section regarding attorney fees, we conclude that litigation expenses are recoverable in this limited type of action; their availability will: (1) decrease incentives for insurers to act in bad faith; (2) encourage insurers to act reasonably; and (3) contribute to actual compensation for plaintiffs for financial cost to them of the breach. The trial court specifically found that "litigation expenses incurred by plaintiffs [were] ... foreseeable to State Farm, particularly in light of State Farm's labored, vexatious and burdensome defense...."; "State Farm knew or should have known that its oppressive defense raised against plaintiffs' claims would be extremely costly to plaintiffs...." These observations underscore the policy reasons supporting our determination that litigation expenses may be awarded in bad faith insurance cases in which the defendant's litigation conduct has been largely responsible for them.

¶ 128 Because a challenge to the amount of litigation expenses awarded is similar to a challenge to the amount of attorney fees awarded or the amount of costs awarded under Utah Rule of Civil Procedure 54(d), we

---

21. We explicitly reject State Farm's proposal to limit the award of attorney fees to $911.25, the amount the Campbells paid to obtain the benefits of their insurance contract with State Farm. Because the very purpose of a bad faith claim is to recover extra-contractual damages—namely, the amount of the excess judgment and any compensatory damages suffered in connection with the insurer's bad faith—it would be entirely incongruent to limit attorney fee awards to those fees incurred to secure the benefits of the insurance contract.

We also reject State Farm's argument that Mr. Campbell's award of attorney fees should be limited to 4% of the total amount of compensatory damages awarded. Examination of the agreement between Mr. Campbell, Slusher, and Ospital reveals that Mr. Campbell is fully liable for all attorney fees unless there is no recovery or a recovery that is insufficient to cover the attorney fees and litigation expenses. Because the recovery here is sufficient, Mr. Campbell is obligated

to pay the full contingency fee in the amount of 40% of the compensatory damages awarded.

22. With respect to State Farm's argument concerning the legitimacy of awarding any expenses, State Farm has failed to meet the requirements of Utah Rule of Appellate Procedure 24. In particular, State Farm has failed to satisfy subsection (a)(5) of rule 24 which requires it to include in its brief "[a] statement of the issues presented for review, including for each issue: *the standard for appellate review with supporting authority.*" (Emphasis added.) Although State Farm's issue statement addresses both attorney fees and litigation expenses, State Farm only cites a case discussing the standard of review for attorney fee awards, not awards for litigation expenses, and makes no attempt to analogize awards of litigation expenses to awards for attorney fees.

review such awards under an abuse of discretion standard. *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 460 (Utah 1993) ("The determination to award taxable costs is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion."); *City Consumer Servs., Inc. v. Peters*, 815 P.2d 234, 240 (Utah 1991) ("The standard of review on appeal of a trial court's award of attorney fees is patent error or clear abuse of discretion." (internal quotation marks omitted)). Moreover, we note that the appropriate measure for awarding litigation expenses is whether such expenses are reasonable and necessary.

¶ 129 In determining that the litigation expenses awarded to Campbells were reasonable and necessary, the trial court made the following written findings:

a. The extensive evidence, from which the litigation expenses arose, was necessary to prove each of plaintiffs' causes of action (i.e. breach of good faith duties, intentional infliction of emotional distress and fraud) as well as to refute State Farm's defenses to these causes of action.

b. In cases of corporate fraud, intentional infliction of emotional distress and breach of good faith duties, there needs to be considerable latitude in presenting evidence to prove intent, reckless disregard, absence of mistake or innocent mistake, a plan or scheme, and outrageous conduct, and to address other elements of these causes of action and the defenses thereto such as those raised by State Farm in this case.

c. State Farm had a policy and practice to destroy historical documents ... and therefore could not produce very substantial relevant documentation during the time period in question. Of plaintiffs' litigation expenses, much was incurred due to this policy and practice of State Farm.

d. At State Farm's request, the case was bifurcated, even though plaintiffs resisted upon the grounds that it would increase the expenses.

e. There were collateral issues of agency, notice, knowledge and general corporate practices that had to be proven by extensive circumstantial evidence, resulting in the large litigation expenses.

f. Compensatory damages, particularly soft damages, are best evaluated and assessed in the context of the totality of all of the circumstances surrounding the wrongful conduct.

g. Though there may have been some overlap in the evidence that was necessary to establish plaintiffs' causes of action for compensatory damages and punitive damages, and the other collateral issues in the case, the Court finds that all of the costs were reasonably and necessarily incurred and are justified for reasons other than those exclusively related to punitive damages.

h. In numerous evidentiary hearings and orders relating thereto, this Court has set forth in more detail the reasons why the extensive evidence was probative, reasonable and necessary to the plaintiffs' case, and the Court adopts its findings and conclusions set forth in [such orders].

¶ 130 From these findings, it is clear that the trial court carefully considered whether the costs requested by the Campbells were reasonably and necessarily incurred during their pursuit of this case. In addition, State Farm failed to present any affidavits or contradictory evidence refuting the evidence offered by the Campbells. Finally, the trial judge himself was present throughout this lengthy and complex trial, and was in a good position to gauge the accuracy of plaintiffs' evidence. We therefore hold that the trial court did not abuse its discretion in accepting the amounts proffered by the Campbells and awarding those amounts as litigation expenses.

## CONCLUSION

¶ 131 In summary, we hold:

1. The trial court's analyses of the punitive damage award under both federal law and the first six *Crookston I* factors was correct. As to *Crookston I* factor seven, we reverse, and reinstate

the jury's award of $145 million on the Campbells' cross-appeal.

2. The trial court did not abuse its discretion in admitting "other acts" evidence relating to State Farm's claims handling practices.

3. The trial court did not abuse its discretion in admitting the testimony of the Campbells' expert witnesses.

4. The trial court did not abuse its discretion in precluding admission of the Slusher/Ospital settlement agreement.

5. The evidence is sufficient to support the jury's finding of fraud by State Farm against Mrs. Campbell.

6. General compensatory and punitive damages may be awarded for fraud.

7. The evidence is sufficient to support the jury's finding of intentional infliction of emotional distress against both Mr. and Mrs. Campbell.

8. The remitted compensatory damage awards granted to Mr. and Mrs. Campbell are not excessive.

9. The trial court's award of attorney fees and litigation expenses are correct.

Therefore, we affirm the judgment against State Farm in all respects, except for the trial court's remittitur of the punitive damage award. On this issue, we reverse the trial court and reinstate the jury verdict awarding $145 million in punitive damages.

¶ 132 Justice WILKINS, Judge BILLINGS, and Judge DAVIS concur in Justice DURHAM's opinion.

¶ 133 Having recused themselves, Chief Justice HOWE and Justice DURRANT do not participate herein. Judge JUDITH M. BILLINGS and Judge JAMES Z. DAVIS from the Court of Appeals sat.

RUSSON, Associate Chief Justice, concurring in part and dissenting in part:

¶ 134 Inez Campbell was never involved in the lawsuit underlying the action now before us, nor could she have been. She was not driving the car that caused the accident, she was never named as a defendant, and she never had any exposure to or became legally obligated to pay damages to any of the claimants. State Farm owed no duty to her under the insurance policy. Only her husband Curtis Campbell was potentially liable, was sued, and was subject to the judgment rendered in that case. State Farm's duty extended only to him.

¶ 135 Ignoring these crucial facts, the trial court in the second stage of the bifurcated trial in this case erroneously instructed the jury *three times* that State Farm had already been found liable to both Mr. and Mrs. Campbell for breaching its fiduciary duty and its duty of good faith and fair dealing. In fact, the jury in the prior stage of the trial never rendered a verdict extending liability for bad faith to Inez Campbell. As a result, the trial court's multiple jury instructions to the contrary misled the jury and, in the process, vitiated State Farm's right to a fair trial. This error was plain, and it tainted every aspect of the verdict now under review,[1] including Mrs. Campbell's independent claims for fraud and intentional infliction of emotional distress. The majority's attempt to nevertheless affirm on so-called "independent" grounds glosses over the fatal flaws explicit in the lower court's judgment and runs contrary to this court's own well-established case law.

## I. INEZ CAMPBELL'S BAD FAITH CLAIM

¶ 136 Although the majority declines to address the issue, it is clear under Utah law that Inez Campbell never had standing to sue State Farm for bad faith. While this court has long recognized tort claims for an insurance company's breach of its implied covenant of good faith and fair dealing, *see Ammerman v. Farmers Ins. Exch.,* 19 Utah 2d 261, 266, 430 P.2d 576, 577–78 (1967), we have always required that plaintiffs wishing to bring such claims first demonstrate a contractual nexus through which their suits arise. As we unanimously held only two years ago in *Sperry v. Sperry,* "Utah law

---

**1.** State Farm raises the issue of Mrs. Campbell's standing to sue for bad faith in point IV.A of its appellate brief.

clearly limits the duty of good faith to first parties to insurance contracts. Consequently, only a first party can sue for breach of that duty." 1999 UT 101, ¶ 7, 990 P.2d 381. This conclusion is as natural as it is logical, for "both first- and third-party claims arise only because of the contractual relationship of the parties." *Savage v. Educators Ins. Co.*, 908 P.2d 862, 866 (Utah 1995).

¶ 137 In this case, Curtis Campbell was a party to the insurance contract with State Farm, and his wife Inez Campbell was not. The contract itself states:

> STATE FARM MUTUAL AUTOMO-BILE INSURANCE COMPANY ... Agrees with the *insured, named in the declarations made a part hereof,* in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to all the terms of this policy....

(Emphasis added.) The only person listed as a "named insured" on the declarations to which the contract refers is Curtis Campbell. In fact, Mr. Campbell is the only person listed on those declarations at all. Consequently, Mr. Campbell was the only one with whom State Farm "[a]gree[d] ... in consideration of the payment of the premium" to provide insurance for those designated as covered by the policy. Mrs. Campbell was

simply a beneficiary of the contract, an additional insured.

¶ 138 Importantly, we have explicitly held that the implied covenant of good faith and fair dealing does not extend to parties who are merely beneficiaries of an insurance policy. In *Savage v. Educators Insurance Co.*, 908 P.2d 862 (Utah 1995), a school bus driver who was insured under an Educators policy purchased by her employer sued the insurance company for allegedly acting in bad faith by resisting to compensate her for medical expenses she had incurred. Recognizing that "the duty of good faith and fair dealing is a contractual covenant, one that arises solely as an incident to contractual obligations owed by an insurer to its insured," Chief Justice Zimmerman's 4–1 opinion, from which Justice Durham dissented, flatly rejected the plaintiff's contention that she had standing to sue. *Id.* at 866. We held:

> Because Savage has no contractual relationship with Educators, she has no cause of action against it for breach of the covenant of good faith and fair dealing. This conclusion is consistent with the commentators and the great majority of courts in other jurisdictions....

*Id.*[2] Nothing is different here. Just as the Jordan School District contracted with Educators for a policy that insured Pat Savage,

---

**2.** Indeed, the overwhelming majority of jurisdictions follow exactly the same rule Utah does: that "the duty of good faith and fair dealing derives from and exists solely because of the contractual relationship of the parties." *Austero v. Nat'l Cas. Co.*, 62 Cal.App.3d 511, 133 Cal. Rptr. 107, 110 (1976); *see, e.g., Lowe v. Am. Med. Int'l,* 494 So.2d 413, 414 (Ala.1986) ("The cause of action for the tort of bad faith refusal to pay was created to protect only the person for whose benefit the insurance payments should have been made."); *Hatchwell v. Blue Shield of California,* 198 Cal.App.3d 1027, 244 Cal.Rptr. 249, 253 (1988) ("Although [Mrs. Hatchwell] was eligible for health care benefits as a Dependent Subscriber [on Mr. Hatchwell's insurance policy], and as such may be termed a 'co-insured' or 'dependent beneficiary,' as she urges, this is not sufficient to establish standing to sue for breach of contract and bad faith based upon the denial of benefits to [Mr. Hatchwell]." (citations omitted)); *Soto v. Royal Globe Ins. Co.,* 184 Cal.App.3d 420, 229 Cal.Rptr. 192, 197 (1986) ("One who is not a party to the insurance contract and the accompanying implied covenant of good faith and fair dealing may not maintain an action for breach of

the covenant."); *Eastham v. Nationwide Mut. Ins. Co.,* 66 Ohio App.3d 843, 586 N.E.2d 1131, 1133 (1990) (holding that a wife did not have standing to bring a bad faith claim against her automobile liability insurer for failing to timely pay the medical expenses of her deceased son, even though she was insured under the policy); *United Fire Ins. Co. v. McClelland,* 105 Nev. 504, 780 P.2d 193, 197–98 (1989) ("[A] wife's coverage as a dependent under her husband's health insurance policy does not give her standing to enforce her husband's contract rights for bad faith denial of health care benefits."); *Vecchiarelli v. Cont'l Ins. Co.,* 216 A.D.2d 909, 628 N.Y.S.2d 892, 893 (1995) (upholding the dismissal of a spouse's claim for bad faith where no contractual nexus was present); *see also Correa v. Pa. Mfrs. Ass'n Ins. Co.,* 618 F.Supp. 915, 929 (D.Del.1985) (finding that the duty of good faith and fair dealing does not extend to the spouse of someone insured under a workers' compensation policy); *Transp. Ins. Co. v. Archer,* 832 S.W.2d 403, 405 (Tex.Ct.App.1992) (disallowing a spouse's suit for bad faith when her husband was denied benefit payments from his workers' compensation carrier).

in this case Mr. Campbell purchased his insurance policy from State Farm, a policy that also insured Mrs. Campbell. Consequently, the contract states by its own terms that it is an agreement between State Farm and Curtis Campbell—and no one else. Had Mrs. Campbell wished to be named as a party to the contract rather than merely as a beneficiary of it, she could have negotiated for that right. Because she did not do so, however, she had no right under Utah law to sue for bad faith. *See Savage,* 908 P.2d at 866.

¶ 139 To this degree, Justice Durham's assertion that any conclusion reached concerning whether Inez Campbell had standing to sue for bad faith is an "advisory" one constitutes nothing less than hyperbolic pretense. The claim for bad faith was the crux of the case against State Farm, and it was for this reason that the lower court bifurcated the trial in the first place. Moreover, our decision in *Savage* addressed precisely the issue in question here. Accordingly, any notion that the question of whether Mrs. Campbell had standing to sue for bad faith is "an open [one] in Utah" can be characterized only as a conclusion that recklessly throws all judicial restraint, particularly in the name of stare decisis, to the wind for the sake of achieving a desired result: a binding judgment against State Farm for its, admittedly, condemnable behavior.

¶ 140 Importantly, however, the law has long recognized that not all actions causing injury enjoy recourse in the courts. *E.g., Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.,* 1999 UT 18, ¶ 140, 974 P.2d 1194 (Zimmerman, J., concurring) ("The law simply does not recognize that every harm suffered should be compensated."); *Demman v. Star Broadcasting Co.,* 28 Utah 2d 50, 53, 497 P.2d 1378, 1380 (1972) (finding that lawsuits cannot be allowed "in every instance"); *see also Black's Law Dictionary* 398 (7th ed. 1999) (" 'There are cases in which the law will suffer a man knowingly and wilfully to inflict harm upon another, and will not hold him accountable for it.' " (quoting John Salmond, *Jurisprudence* 372–73 (Glanville L. Williams ed., 10th ed.1947))). This rule of *damnum absque injuria* applies regardless of how offensive or inappropriate society might find an actor's conduct to be, and this court has itself repeatedly barred recovery for conduct that could very well be considered condemnable but for which there is no cause of action. *See, e.g., Sears v. Ogden City,* 572 P.2d 1359, 1362 (Utah 1977) (holding that there is no recovery for government action making access to one's property difficult and inconvenient); *Demman,* 28 Utah 2d at 53, 497 P.2d at 1380 (denying recovery for slander to a losing political candidate after a radio station broadcasted "obnoxious" remarks by a caller who asserted that the candidate was unqualified and a felon); *N.M. Long & Co. v. Cannon–Papanikolas Constr. Co.,* 9 Utah 2d 307, 310, 343 P.2d 1100, 1102 (1959) (affirming judgment for no recovery from defendants who had made unusable plaintiff's fish pond business by draining water from their property); *Twenty–Second Corp. of the Church of Jesus Christ of Latter-Day Saints v. Oregon Short Line R.R. Co.,* 36 Utah 238, 255–56, 103 P. 243, 249–50 (1909) (disallowing recovery for disruption of worship services caused by operation of a railroad near a church on Sundays). Consequently, regardless of Justice Durham's assertion to the contrary, it absolutely does matter what legal theory plaintiffs hang their damages on, because failure to sufficiently prove all elements of a given cause of action makes the difference between an injury for which the law provides recourse and one for which there is no legal remedy at all. As such, the majority opinion's curious admission that the jury was not "at all affected in its decision and verdict by the legal labels applied to describe [State Farm's] conduct" in this case both undermines the logic of the opinion itself and emphasizes the importance of whether Mrs. Campbell had standing to sue for bad faith. For if, as the majority recognizes, the jury disregarded the appropriate legal standard in an attempt to "punish" State Farm for conduct the jury found offensive, that is unrefuted evidence of error in law, passion, and prejudice on the jury's part—necessitating a new trial on the court's own motion. *See, e.g., Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078, 1084 (Utah 1985); *Paul v. Kirkendall,* 1 Utah 2d 1, 3, 261 P.2d 670, 671 (1953); Utah R. Civ. P. 59. Moreover, the majority's recognition that the jury disre-

garded the applicable legal standards in this case actually helps explain the great extent to which the trial court's erroneous instruction that State Farm had committed bad faith against Mrs. Campbell confused and inflamed the jury. *See infra* part III.A.

¶ 141 Indeed, the majority's reluctance to recognize that Mrs. Campbell never had standing to sue for bad faith only highlights the problems created at the trial level when the lower court inappropriately allowed Mrs. Campbell standing. In fact, the trial court's failure to recognize that Mrs. Campbell did not have standing to pursue a bad faith claim for State Farm's failure to settle the lawsuit against Mr. Campbell eventually led to the court's rendering a faulty verdict in the first stage of the case, and then erroneously instructing the jury in the second stage that State Farm had already been found liable to Mrs. Campbell for bad faith when no such verdict had ever been rendered.

## II. THE TRIAL COURT'S FAULTY VERDICT AND ERRONEOUS INSTRUCTION

¶ 142 This case was bifurcated, resulting in two different jury trials with verdicts. The jury in the first stage of the bifurcated trial was asked by the special verdict form only whether there was a likelihood of a judgment being entered in favor of various claimants against *Curtis Campbell,* and whether State Farm had "act[ed] unreasonably when it chose not to settle [the various claims] against *Curtis B. Campbell* for *Mr. Campbell's* policy limit." (Emphasis added.) Never was the jury in this first stage of the bifurcated trial asked to answer any question that pertained to Inez Campbell, and the jury accordingly never entered any such verdict in her favor.[3]

¶ 143 However, after reciting the jury's special verdict that addressed only State Farm's actions with respect to Curtis Campbell, the judgment entered in the first stage

of the bifurcated trial stated, "Based on the above findings by the jury, ... *plaintiffs* are granted judgment of liability against defendant State Farm ... based on State Farm's breach of its duty to act in good faith in defending Curtis Campbell." (Emphasis added.) Therefore, with no further explanation, the court ordered that State Farm was liable to both Curtis and Inez Campbell solely on the basis of the jury's findings that State Farm had breached its duty to Curtis Campbell. This giant leap of faith and logic assumed that liability can arise out of the ether for one plaintiff if a jury finds it for another, a result wholly at odds with Utah procedure and law. *See, e.g., Brigham v. Moon Lake Elec. Ass'n,* 24 Utah 2d 292, 298, 470 P.2d 393, 397 (1970) (when special verdict submitted, jury finds facts and court applies law); *Colovos v. Home Life Ins. Co. of New York,* 83 Utah 401, 414, 28 P.2d 607, 612 (1934) (court enters judgment on the verdict); Utah R. Civ. P. 47(q) (jury declares verdict). To be sure, this failure to conform to the verdict was plain error, rendering the judgment void on its face and requiring our reversal of Mrs. Campbell's bad faith claim on appeal—especially given the unavoidable conclusion that Mrs. Campbell never had standing to sue for bad faith in the first place.

¶ 144 Moreover, the trial court's faulty judgment eventually resulted in severely misleading the jury in the second stage of the bifurcated trial. Indeed, in the second stage of the case, the trial court erroneously instructed the jury *three times* that the previous jury had found State Farm liable to Inez Campbell for bad faith even though no such determination had ever been made. State Farm objected to this instruction, but the court gave the erroneous instruction nevertheless. For instance, jury instruction 25 stated:

> You are instructed that a previous jury in this case has found ... that State Farm acted unreasonably in not settling [the]

3. As explained above, there was good reason the jury in the first stage of the bifurcated trial was never asked questions as to breach of duty to Inez Campbell. State Farm did not owe a duty to Inez Campbell to settle the case in her behalf. Inez Campbell was not the driver of the vehicle

involved in the accident and had no exposure of liability for claims arising from the accident. For the same reason, she was not named as a defendant in the underlying case in Cache County.

claims against *Mr. Campbell* before the Cache County verdicts. This means that State Farm breached its duties of good faith and fair dealing and its fiduciary duty to *Campbells* to settle the claims against Curtis Campbell within the policy limits. (Emphasis added.) Likewise, jury instruction 28 informed the jury that "State Farm breached its fiduciary duties and duties of good faith and fair dealing to *the Campbells*," and thus, that the jury could award "compensatory damages ... caused by State Farm's breaches of these duties." (Emphasis added.) Even the special verdict questions put to the jury were prefaced with the statement that

> [i]t has previously been determined that State Farm breached its duty of good faith and fair dealing towards *the Campbells.*

(Emphasis added.) As noted, however, this statement simply was not true. The jury in the first stage of the trial never found liability toward Inez Campbell. The trial court's multiple instructions to the contrary in the second stage of the trial were misleading to the jury and constituted plain and prejudicial error, for the jury's erroneous assumption that State Farm was liable to Inez Campbell for bad faith permeated every aspect of the verdict rendered in the second stage of the trial.

## III. THE PREJUDICIAL EFFECTS OF THE TRIAL COURT'S ERROR

¶ 145 Because the trial court erroneously instructed the jury in the second stage of the bifurcated trial that State Farm had been found liable to Mrs. Campbell for bad faith, the judgment from the trial's second stage must be vacated and remanded as to Inez Campbell's claims for fraud and intentional infliction of emotional distress, and as to the punitive damages award rendered jointly to Mr. and Mrs. Campbell. Those instructions tainted the jury's consideration of Mrs. Campbell's claims for fraud and intentional infliction of emotional distress, thus preventing any chance that State Farm would receive a fair trial on those issues or on the issue of punitive damages. Moreover, the erroneous instructions fundamentally altered the jury's consideration of punitive damages in contravention to our decision in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991). Indeed, both independently and together, the trial court's severe missteps in this regard constituted plain error necessitating reversal on appeal—especially given that such errors occurred, not because the trial court mistakenly overlooked a matter of procedure or law, but as a result of the court's own affirmative actions in respect to the verdict in the first stage of the case and the jury instructions and special verdict form in the second.[4]

### A. Right to a Fair Trial

¶ 146 All parties to litigation—plaintiff and defendant alike—are entitled to a fair trial. In Utah, this right to a fair trial has long included the right to "a presentation of the case to the jury under instructions that clearly, concisely and accurately state the issues and the law applicable thereto so that the jury will understand its duties." *Hanks v. Christensen*, 11 Utah 2d 8, 12, 354 P.2d 564, 566 (1960); *see also, e.g., Rowley v. Graven Bros. & Co.*, 26 Utah 2d 448, 451, 491 P.2d 1209, 1211 (1971); *Brunson v. Strong*, 17 Utah 2d 364, 368, 412 P.2d 451, 454 (1966); *Williams v. Lloyd*, 16 Utah 2d 427, 429, 403

---

4. Justice Durham, in a single paragraph, apparently takes exception to the entire dissent on the ground that the parties failed to raise the "wording" of the trial court's faulty verdict from the first stage of the case below or on appeal. Despite this bald assertion, State Farm did specifically challenge on appeal the trial court's determination that Mrs. Campbell had standing to sue for bad faith. In fact, State Farm argued that "[t]he court below" should not have "concluded that Mrs. Campbell had standing" based "solely on her marital relationship to Curtis Campbell." Moreover, this court has repeatedly held that we "may consider issues raised for the first time on appeal if the trial court committed plain error." *Julian v. State*, 966 P.2d 249, 258 (Utah 1998); *see also, e.g., Green v. Louder*, 2001 UT 62, ¶ 34, 29 P.3d 638 (Durham, J.); *State v. Helmick*, 2000 UT 70, ¶ 8, 9 P.3d 164 (Durham, J.); *Berenda v. Langford*, 914 P.2d 45, 51 n. 1 (Utah 1996); *Salt Lake City v. Ohms*, 881 P.2d 844, 847 (Utah 1994); *State v. Germonto*, 868 P.2d 50, 58 (Utah 1993) (Durham, J.); *State v. Brown*, 853 P.2d 851, 853–54 (Utah 1992) (Durham, J.). The trial court's actions in this case unequivocally constituted plain error, a point made repeatedly throughout the dissent. *See supra* ¶¶ 135, 140, 143, 144, 145, 149; *infra* ¶ 155.

P.2d 166, 167 (1965); *Wellman v. Noble,* 12 Utah 2d 350, 352, 366 P.2d 701, 702 (1961); *Utah State Nat'l Bank v. Livingston,* 74 Utah 456, 458–59, 280 P. 327, 327–28 (1929). In this case, however, the instructions given by the court to the jury were anything but "clear" or "accurate," and State Farm consequently never received a fair trial.

¶ 147 In fact, the instructions' multiple erroneous statements that State Farm had been found liable to Inez Campbell for bad faith possessed only the possibility to confuse the jury and the issues it was to decide. Perhaps most problematically, the court's erroneous statements "took the jury's mind from the real issue" of whether State Farm was liable under Mrs. Campbell's claims for fraud and intentional infliction of emotional distress by "emphasiz[ing] [a] situation[ ] ... not supported" by the facts or law—that State Farm was already liable to Inez Campbell for bad faith. *Taylor v. Johnson,* 15 Utah 2d 342, 349–50, 393 P.2d 382, 387–88 (1964). We have previously held that such an effect violates a party's right to a fair trial, and nothing militates to the contrary here. *See id.* Likewise, the court's instructions created the misperception that Mrs. Campbell's claims were inextricably bound up in, and caused by, State Farm's actions toward Mr. Campbell. In so doing, the court impermissibly confused the jury by repeatedly referring to "the Campbells" in the aggregate, rather than by separating the two plaintiffs and their respective claims as required by law. *Cf. Nielsen v. Pioneer Valley Hosp.,* 830 P.2d 270, 274 (Utah 1992) (holding that plaintiff had been denied her right to a fair trial when the court gave instructions confusing the two legal theories on which she was pursuing her claim); *King v. Barron,* 770 P.2d 975, 977 (Utah 1988) (finding severance appropriate where merging trial for plaintiff's legally unrelated claims "would invite error and confusion" by forcing jury to consider different evidence and theories in relation to separate defendants). Had the court specifically instructed the jury that Inez Campbell's claims for fraud and intentional infliction of emotional distress were entirely separate from those lodged by Curtis Campbell—or had it severed Mrs. Campbell's suit from Mr. Campbell's upon making the correct and appropriate determination that she had no standing to sue for bad faith—then the prejudicial effects of this statement arguably would have been avoided. But the court did not take such an action, and as a consequence both the entire verdict as to Mrs. Campbell and the punitive award, which was rendered jointly as to Mr. and Mrs. Campbell, were irreparably tainted by the court's denying State Farm its right to a fair trial.

¶ 148 Indeed, the lower court's violation of State Farm's right to a fair trial in this case is especially flagrant in view of the great care with which trial courts are required to select juries. The process of voir dire exists so that courts can ensure "a fair and impartial jury [is] chosen." 47 Am.Jur.2d, *Jury* § 189, at 871 (1995). Likewise, partiality, prejudice, and bias all constitute reasons upon which a trial court may excuse a juror for cause, Utah R. Civ. P. 47(f)(6), and we have specifically held that trial "judges should err on the side of caution in ruling on for-cause challenges," as courts' discretion in this area is limited due to the "ease with which all issues of bias can be dispensed by the simple expedient of replacing a questionable juror with another whose neutrality is not open to question." *State v. Saunders,* 1999 UT 59, ¶ 51, 992 P.2d 951. As a result, we have further held that where a jury considers in its deliberations evidence not introduced at trial, a new trial is required to ensure fairness and impartiality of the ultimate result. *See State ex rel. Road Comm'n v. White,* 22 Utah 2d 102, 103, 449 P.2d 114, 115 (1969).[5] Similarly, courts uniformly re-

---

5. *Accord United States v. Castello,* 526 F.Supp. 847, 848–50 (W.D.Tex.1981) (granting a new trial where a juror conducted ballistic experiments and reported the results to the jury); *Frede v. Downs,* 101 Ill.App.3d 812, 57 Ill.Dec. 355, 428 N.E.2d 1035, 1037 (1981) (remanding for a new trial a collision case in which the jury referred to a boating handbook not admitted as evidence); *Brockie v. Omo Constr., Inc.,* 255 Mont. 495, 844 P.2d 61, 63–64 (1992) (reversing trial court's decision not to grant a new trial where jury foreman researched physics questions at issue in the case and reported his findings to other jurors); *Arthur v. Washington Iron Works,* 22 Wash.App. 61, 587 P.2d 626, 629 (1978) (ordering a new trial where jurors went to the public

quire dismissal of potential jurors who have prior knowledge of facts material to the dispute, and require a new trial where such jurors were not dismissed. *See, e.g., Lewis v. State ex rel. Baxley,* 260 Ala. 368, 70 So.2d 790, 791–92 (1954) (affirming trial court's decision to dismiss six jurors from a disciplinary proceeding because their animals had been treated by the veterinarian under review); *Barker v. Commonwealth,* 230 Va. 370, 337 S.E.2d 729, 733 (1985) (reversing a conviction for rape, sodomy, and malicious wounding because juror who knew of defendant's prior conviction on the same charges, which had been overturned and was being readjudicated, was not excused). And in cases where media coverage is so "extensive" that it precludes a party from "receiv[ing] a fair and impartial trial," we have held that trial courts must take protective measures, such as allowing change of venue, to ensure a fair trial. *See, e.g., State v. James,* 767 P.2d 549, 554 (Utah 1989). In fact, even in the face of countervailing constitutional concerns, we have allowed trial courts to issue temporary restraining orders restricting during-trial publicity so that the parties hold a greater chance of receiving a fair trial. *See KUTV, Inc. v. Wilkinson,* 686 P.2d 456, 461 (Utah 1984). It is for this same reason that trial judges examine potential jurors at length about any outside information they may have received concerning the case at issue and whether they have any preconceived notions about the parties or the subject matter in dispute. Upon finding that such partiality exists, a judge will properly excuse that potential juror from service, just as courts repeatedly and appropriately instruct the eventually impaneled jurors not to discuss the case with anyone or to consider any media coverage of the suit or other outside evidence. *See* Model Utah Jury Instructions, Civil 1.8 (Michie 1993). In this case, however, the trial court nullified any prior efforts it had made to impanel a fair and impartial jury by itself giving the jury erroneous information, namely, that State Farm had already been found liable to Mrs. Campbell for bad faith. Had a potential juror admitted to such an erroneous belief

upon reporting for duty, he or she certainly would have been excused. But here, it was the trial court's own instruction that misled the jury and, thus, encroached on State Farm's right to a fair trial.

¶ 149 Accordingly, the majority opinion's bare assertion that Mrs. Campbell's fraud and intentional infliction of emotional distress claims "provide[ ] an independent basis for sustaining all of Mrs. Campbell's damages" cannot support an affirmance of the lower court's judgment. Not only does Justice Durham fail to attempt to explain how those theories of liability account for the damages the jury actually awarded, but the judgments rendered to Mrs. Campbell on her claims for fraud and intentional infliction of emotional distress are void ab initio due to the court's breach of State Farm's right to a fair trial.

### B. Punitive Damages

¶ 150 Apart from the problems created by the lower court's denying State Farm its right to a fair trial, the court's multiple erroneous instructions to the jury that liability had been found as to Inez Campbell for bad faith prejudiced State Farm further by skewing the fundamental considerations required for determining punitive damages.

¶ 151 The jury was asked in the second stage of the bifurcated trial to award damages to both Curtis Campbell and Inez Campbell, and in doing so awarded *compensatory damages* to Curtis Campbell in the amount of $1.4 million and to Inez Campbell in the amount of $1.2 million. The jury was also asked to award *punitive damages,* if any, which it did in the amount of $145 million but without designating which portion of the amount was awarded to Inez Campbell and which portion was awarded to Curtis Campbell.

¶ 152 In its determination of punitive damages, the jury had been specifically instructed by the trial court to consider, among other things, "the effect of defendant's misconduct on the lives of the Campbells," "the relationship between the parties," and "the amount of compensatory damages awarded."

library "looking for handbooks" related to the case and "examin[ed] the yellow pages of the

telephone book concerning" witnesses that had been called during trial).

This jury instruction was given in compliance with our decision in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), which held that a jury awarding punitive damages must be charged with considering seven factors in order to determine the appropriate amount of the award. These factors include "(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) *the effect thereof on the lives of the plaintiff and others;* (v) the probability of future recurrence of the misconduct; (vi) *the relationship of the parties;* and (vii) *the amount of actual damages awarded.*" *Crookston,* 817 P.2d at 808 (emphasis added). However, because the jury was operating under the false assumption that State Farm was liable to Inez Campbell for bad faith, it could not possibly have given proper consideration to each of these factors, and the majority consequently sets dangerous precedent by reinstating the jury's original punitive award for $145 million rather than remanding to the trial court for further deliberations on punitive damages.

¶ 153 Indeed, the jury granted Mrs. Campbell $1.2 million in compensatory damages for her injury, and we can only assume that the jury followed the judge's instructions and based its punitive award, at least partially, on the effect of State Farm's alleged misconduct on Mrs. Campbell's life. *See, e.g., Nielsen v. Pioneer Valley Hosp.,* 830 P.2d 270, 275 (Utah 1992) ("[J]urors are sworn to follow the instructions as given by the court . . . ."). As instructed by the court, the jury understood a good portion of such misconduct to include State Farm's breach of its duty of good faith and fair dealing, but as explained, State Farm did not owe Mrs. Campbell such a duty and no jury had ever found that State Farm had breached it to her. This is enough by itself to require a reassessment of the punitive award at the trial level, since the judgment rendered to punish State Farm is inexplicably tied to "misconduct" that State Farm did not—and could not—commit.

¶ 154 Moreover, the punitive award does not reflect an appropriate consideration of *Crookston*'s sixth factor, the relationship of the parties. The analysis undertaken by any jury properly employing our seven factors for punitive damages will be fundamentally altered when informed that, as a matter of law, one of the plaintiffs in the case has no standing to sue for one of the claims lodged. Especially here, where Mrs. Campbell's claim for bad faith was her only assertion of a fiduciary relationship with State Farm, it is imperative that we remand the punitive damages award for further proceedings. To be sure, even if Inez Campbell's remaining claims for fraud and intentional infliction of emotional distress survived the problems created by the unfair trial given to State Farm in this case, which they do not, they neither create nor demonstrate any relevant legal relationship between Mrs. Campbell and State Farm. The precise effect such a revelation would have had on the jury falls only within the realm of pure speculation, but given our own mandate that the jury consider, not a fictional, but the actual "relationship of the parties" in determining punitive damages, this too requires that we remand to the trial court for further proceedings.

¶ 155 Finally, the punitive damages award must fail because it was awarded jointly to Mr. and Mrs. Campbell rather than separately to each plaintiff. Even if the trial court had properly severed Inez Campbell's claims from her husband's, which it did not, the punitive award would have to be remanded under *Crookston* due to its joint nature. Mrs. Campbell's claims were entirely independent from Mr. Campbell's, but because punitive damages were awarded jointly as to both these plaintiffs, we cannot now know what portion of the award the jury intended to be owed to Inez Campbell and what portion it intended to be owed to Curtis Campbell. Accordingly, because Mrs. Campbell's claims for fraud and intentional infliction of emotional distress must be remanded while Mr. Campbell's need not—and because, as explained, the jury was inappropriately instructed to commingle the two plaintiffs in its consideration of the fourth and sixth *Crookston* factors—the punitive damages award must be vacated and remanded for further

proceedings.[6]

## IV. CONCLUSION

¶ 156 Inez Campbell had no standing to sue State Farm for bad faith, and the jury never found that State Farm was liable to her in that regard. Her only actionable claims were for fraud and intentional infliction of emotional distress. As a result, the trial court's multiple instructions that State Farm had been found liable to Mrs. Campbell for bad faith tainted both the entire verdict as to Mrs. Campbell and the punitive damages assessed against State Farm in behalf of Mr. Campbell. Accordingly, I would (1) reverse as to Mrs. Campbell's claim for bad faith, (2) vacate and remand for a new trial on Mrs. Campbell's claims for fraud and intentional infliction of emotional distress, (3) affirm on the issue of State Farm's liability to Mr. Campbell, and (4) vacate and remand for a new trial on the issue of punitive damages as to Mr. Campbell inasmuch as that award was rendered jointly to both Mr. Campbell and Mrs. Campbell.

---

**6.** Contending that *Crookston* does not question the legitimacy of joint punitive damage awards, the majority opinion assails the argument that the punitive award in this case must be vacated. However, the majority's contention must fail for at least two reasons. First, in characterizing the necessity for vacating the punitive award solely "due to its joint nature," Justice Durham oversimplifies the reasons stated above for why the award must fail. While *Crookston* did recognize the policy objectives of punitive damages to include "punish[ment] and deter[rence]," 817 P.2d at 807, we specifically held in *Crookston* that awards rendered for such purposes must be constrained by well established "parameters" that tether punitive damages to some sense of reasonableness in order to avoid "excessive awards." *Id.* at 808. Those parameters include the seven factors listed above, which *"must* be considered [by the jury] in assessing the amount of punitives." *Id.* (emphasis added). Because, as explained above, the jury was unable to properly consider two of those factors in this case due to the trial court's erroneous instruction that State Farm had been found liable to Mrs. Campbell for bad faith, the punitive award must be vacated and remanded. *See id.; C.T. ex rel. Taylor v.*

*Johnson,* 1999 UT 35, ¶¶ 17–26, 977 P.2d 479 (upholding a punitive award only because the trial court's failure to instruct the jury to consider all of the seven *Crookston* factors was harmless since the jury did in fact fully and properly assess each factor); *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.,* 850 P.2d 447, 458–59 (Utah 1993) (affirming a punitive award because the jury "made a detailed finding based on the seven factors enunciated in *Crookston* "). Indeed, nowhere in her opinion does Justice Durham even attempt to address this issue. Second, there is good reason why the "joint nature of the punitive damages award was never questioned" in *Crookston.* Unlike the case now before us, neither of the parties involved in *Crookston* ever had their standing to sue questioned, nor was the issue raised on appeal. Consequently, the problematic situation created here—where one party who was awarded punitives had every right to sue but the other party given the same award should have never been involved in the lawsuit—simply did not exist in *Crookston.* *See* 817 P.2d at 794 (recognizing that both Mr. and Mrs. Crookston were named as insureds in their homeowner's policy).